## CRAFT v. NORTHERN PAC. R. CO.

(Circuit Court, D. Oregon. August 13, 1894.)

### No. 2,044.

1. MASTER AND SERVANT—NEGLIGENCE—DEATH OF EMPLOYE—EVIDENCE.
    In an action against a railroad company for the death of plaintiff's intestate, evidence that deceased could have been seen in time to avoid running over him, and that the engineer was probably asleep, is sufficient to sustain a verdict of negligence.

2. SAME—CONTRIBUTORY NEGLIGENCE.
    The fact that a railroad employé was walking on the track when killed is not conclusive of his negligence.

**3. PROVINCE OF JURY—CREDIBILITY OF WITNESSES.**

Under Code Or. § 683, making the jury exclusive judges of the credibility of witnesses, they may disregard uncontradicted testimony, where it is unsatisfactory to their minds.

Action by Julia Craft, administratrix of the estate of Benjamin P. Craft, deceased, against the Northern Pacific Railroad Company. There was a verdict for plaintiff, and defendant moves for a new trial. Denied.

E. B. Watson and B. B. Beekman, for plaintiff.

Joseph Simon, for defendant.

BELLINGER, District Judge. This is an action for damages for the death, through defendant's negligence, of Benjamin P. Craft, son of the plaintiff, who brings the action as administratrix of his estate. The jury found a verdict for plaintiff in the sum of $3,320. Defendant moves for a new trial on the ground that the evidence is insufficient to sustain the verdict. The deceased was a car counter for the defendant on the terminal grounds in this city. He was run over and killed by an engine in the yards of the company early in the morning of August 15, 1893. He was last seen alive about 1:30 on that morning, some three or four hundred feet north of the depot, in this city, going north on the platform along the track, carrying a lighted lantern. The accident occurred about 2 o'clock, or a little after, near the spot where the deceased was last seen, about 50 feet north of such place, according to the testimony of the witness who last saw him alive. The engine that ran over Craft came into the station about 12:45 that night with a train, and shortly afterwards went north to the coal bunkers, not quite a quarter of a mile from the depot, to coal up. Having done this, the engine started back to the depot. Stapleton was the engineer in charge. A switchman named Berry and a watchman named Cobb accompanied the engine. A platform extends from the depot to a point a little north of where Craft was struck. About 200 feet south of the north end of this platform is a switch leading to the roundhouse. It was Berry's habit, when coming up from the coal bunkers with an engine, to jump off the engine after reaching the platform, and run ahead, and throw this roundhouse switch. On this occasion he jumped off at a point about 50 feet south of the north end of the depot platform, and ran ahead to the switch,—a distance of about 150 feet. He had reached the switch, and taken hold of it, when he heard somebody halloo, and, looking in that direction, saw a man on the end of the pilot of the engine, being pushed along. Berry hallooed twice to the engineer—calling him by name—to stop the engine. The engine was stopped shortly after this, when Berry, jumping upon it, laid his hand on the engineer, saying, "Stapleton, the engine has run over a man." At this time the engineer was sitting in his seat, but, upon being accosted by Berry in this way, he threw his legs around the lever, and got down off the engine. Cobb was in the act of getting off the engine when Berry got on. According to Berry's statement, the engineer did not have hold of the lever when he, Berry, took hold of him. The man on the pilot passed under the

engine just after Berry heard the halloo and saw him. The dead body of Craft was afterwards found on the track at this point. It appeared from an examination of the track that deceased was struck about 150 feet from where his body was found. His lantern was picked up near the place where he was first struck. It was lying alongside of the track, unbroken, but with the light out. The engine had a large headlight, which was burning when the accident occurred. There was also an electric light at the depot, probably three or four hundred feet distant. The engineer testified that he could have seen a man lying on the track a distance of 50 feet, if the headlight was thrown straight on the track. A man standing or walking on the track could be seen further. The track curves before reaching the point where the deceased was struck, but there is nothing tending to show that the ability of those on the engine to see far enough ahead to have noticed a person lying or walking on the track in time to have stopped the engine was in the least affected by the curve. There is a clear, unobstructed view for a distance of 100 feet from where deceased was struck, and the light must have been reflected upon the track at least a considerable part of this distance. The engineer testifies that the engine was running about four miles an hour. At least her speed was slow enough to permit the switchman to jump off, and run ahead to the switch. The deceased had made arrangements to go on his vacation, for a month, on the next day. He had taken some beer during the evening, and there is testimony to the effect that he was more or less intoxicated. One witness, an employé, met deceased about 11:45. They had one glass of beer together. He saw deceased eat his lunch about 12:30, and was the last person to see him alive, as he went down the platform with his lantern about 1:30 in the morning. This witness says deceased was pretty full, but that he was able to do his work; that he staggered a couple of times, and bumped against the witness, as they crossed the street together. Another witness says he saw deceased, about 12 o'clock, walking between the witness just referred to and a Mr. Tucker, and that he was jogging first against one and then the other; that he seemed to be a little unsteady on his feet. This Mr. Tucker was also a witness, and he testified that he had one glass of beer with deceased; that he could not see anything wrong with him, and could not swear that he was under the influence of liquor. When pressed by the attorney for the company, he said, in answer to a leading question, that deceased was "slightly intoxicated." All these witnesses are in the service of the company. There was testimony to the effect that near where deceased was struck there were indications of some one having vomited. Berry, the switchman, testifies that he rang the engine bell up to the time he got off the engine, and the engineer testifies to the same thing.

Upon these facts it is contended that there is no evidence tending to prove negligence on the part of the company, and that it conclusively appears that the accident was the result of the negligence of the deceased, or at least was contributed to by negligence on his part. The deceased was last seen about one-half hour before the accident. He was then in the vicinity of where the accident oc-

curred, and was walking on the platform, going north. The theory of the defense is that he became sick, and fell or lay down on the track where he was struck. This is not a necessary inference from the evidence, and the jury was not required to adopt it. It is not for the court to determine as to the probabilities. That is for the jury. The alleged intoxication of deceased, and the evidence of .sickness, were proper to be considered; but neither the evidence of those facts, nor the facts themselves, are such as to preclude the jury from finding as it did. Neither of the witnesses as to the intoxication of the deceased seemed to regard it as in any way interfering with the proper discharge of his duties. He ate his lunch at 12:30, no indications of which were found in what is claimed to have come from his stomach not longer than one and a half hours thereafter. If he was so much intoxicated that he fell helpless upon the track within 50 feet of where he was last seen, his intoxication must have been so gross as to render him incapable of rational talk or action at the time he is described as walking up the platform with his lighted lantern, seemingly capable of doing his work all right, and just after he had talked "rationally enough" with one of the witnesses whose testimony is relied upon to prove his intoxication. True, he may have gone into a saloon further up the track, but there is no presumption that he did so. The jury was not only not required to find that deceased was lying upon the track when struck, but such a finding would have been against the strong probabilities. Had he been lying upon the track, he would probably have been run over on the spot, and would not have been seen at the end of the pilot, being pushed along 150 feet further south, hallooing loud enough to attract Berry's attention. The testimony warrants the inference that the deceased went up the track from where he was last seen about some of his usual duties, and that he was returning along the track. Having come from a direction where there was no platform, he might naturally continue along the track for a short distance after reaching the point to which the platform extended. While thus walking with his back to the approaching engine, he was overtaken by it. The inference is also warranted that the engineer was asleep in his seat, or partially so, or was otherwise incapable of properly attending to his duties. A wide-awake man, looking ahead, must have seen deceased, whether he was walking upon the track or lying across it. There must have been something unusual in the conduct of the engineer, that caused the switchman to jump upon the engine, and lay hold of him, and say, "Stapleton, the engine has run over a man." The engine had stopped, but the engineer did not move. He did not even have hold of the lever, as he would likely have had, had he, and not Cobb, stopped the engine. The testimony of the switchman has a significant bearing upon this part of the case. The witness could not be got to say that Stapleton was asleep, and that Cobb was running the engine. But the way in which he avoids saying it is suggestive of the fact that such was the case. Cobb was in a position to know about the facts of the accident. If the engineer was sleeping in his seat, Cobb probably knows it. He knows whether he or the engineer stopped the engine. It was stated in court, upon in-

formation furnished by Stapleton, that Cobb was in the service of the defendant at Tacoma; but his whereabouts were not disclosed to the company's attorney, who inquired at its office in this city for the purpose of finding him. The absence of Cobb creates an impression unfavorable to the defense. The probabilities are that Stapleton was asleep; that when Berry heard the cry of deceased, and hallooed to the engineer, Cobb stopped the engine; and that deceased was run over while walking along the track in the same direction the engine was going. Such, in my opinion, are the probabilities of the case, but probabilities are not required. It is enough if the facts warrant such inferences as will sustain a finding of negligence against the defendant. The fact that deceased could have been seen in time to avoid running over him is evidence sufficient to sustain a verdict of negligence. Railroad Co. v. Patterson (Colo. App.) 36 Pac. 913; Felch v. Railroad Co. (N. H.) 29 Atl. 557. The fact that the deceased was walking upon the track is not conclusive of his negligence. It is a fact for the jury to find from, not one to authorize a judgment by the court.

It is argued with much force that at least the deceased must be conclusively presumed to have been guilty of contributory negligence, since the uncontradicted evidence is that the engine bell was rung, and that this bell could be heard for a long distance. If the bell was rung, the deceased must have heard it, and hence must have been guilty of negligence in remaining on the track, or if, for any reason, he could not hear, he was guilty of such negligence in placing himself where he could not be warned of the approach of an engine. The switchman, Berry, and the engineer, Stapleton, both swear that the bell was rung. There is nothing to contradict this testimony. But suppose, nevertheless, the jury refuse to believe the testimony. This, it must be assumed from the verdict, is what they have done. It is the province of the jury to pass upon the credibility of all witnesses, whether they are contradicted or not; and, while a witness is presumed to speak the truth, the manner in which he testifies, or the character of his testimony, is sufficient to overcome that presumption. Code Or. § 683. The jury are not bound to find in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a presumption or other evidence satisfying their minds. Id. § 845. It must not be assumed that this right of a jury to disregard the testimony of any number of witnesses is a right to be arbitrarily or wantonly exercised. If it should be unreasonably exercised, it would become the duty of the court to correct the injury done in the particular case by setting aside the verdict. In this case, what has already been said as to Stapleton justified the jury in disregarding his testimony. There was enough in the manner in which Berry testified to lead the jury to distrust him, where a question of his own failure of duty was involved. He was an interested witness, beyond the interest which his employment and its consequent duty involved. He has every inducement that can exist, where the question is one of responsibility for the death of a fellow workman, to shield himself from blame. The distance from the coal bunkers to where Berry got off was comparatively short,

and since he expected to get off, and run ahead to the switch, he may have been occupied with this object, and omitted to ring the bell. He says he always watched out when he struck the platform, so as to get off, and does not remember whether anybody rang the bell after he got off. This tends to show that the matter of ringing the bell was not regarded as of the first importance. The greater care was in looking out for switches. I think it probable that the bell was not rung on the return from the coal bunkers, notwithstanding Berry's statement that it was. However that may be, if the jury concluded that the bell was not rung, as they must have done, and my own belief was otherwise, I should not, in view of the facts in the case, feel justified in setting the verdict aside on that account. The motion for a new trial is denied.