Argued October 13, 1937; affirmed March 8, 1938

# FLEISHHACKER ET AL. *v.* PORTLAND NEWS PUBLISHING CO.

(77 P. (2d) 141)

In Banc.

*Roy F. Shields* and *Donald K. Grant*, both of Portland (Maguire, Shields & Morrison and Donald K. Grant, all of Portland, on the brief), for appellant.

*John R. Latourette* and *Charles A. Hart*, both of Portland (Latourette & Latourette and Carey, Hart, Spencer & McCulloch, all of Portland, on the brief), for respondents.

BELT, J. In August, 1935, plaintiffs commenced an action against defendant to recover the sum of $46,-342.72 and interest thereon for alleged breach of contract in that defendant failed and refused to meet its obligations to assume all liabilities of the Portland Telegram under a lease entered into between it and Rose Barde et al. on December 3, 1921, covering the Telegram building in the city of Portland. Plaintiffs, who were the owners of all the stock of the Portland Telegram, a corporation, were sued by the lessors, Rose Barde et al., in California, and judgment was obtained against them for the amount due as rental under the lease. Plaintiffs satisfied such judgment and ask, in the instant action, by virtue of their contract with the defendant, to be reimbursed for the money thus paid.

Defendant does not seriously challenge the right of the plaintiffs to be reimbursed for the money paid in satisfaction of the judgment, but in a counterclaim seeks to recover damages in the sum of $500,000, by reason of having been induced through fraudulent representations to enter into a contract on May 25, 1931, to purchase from plaintiffs the capital stock and assets of the Portland Telegram.

The specific charges are that plaintiffs falsely and fraudulently represented:

"First, that the Telegram was occupying the leased premises under a month to month tenancy, and had not executed any writing or agreement, or otherwise bound itself to pay rental after it should cease to occupy the premises;

"Second, that the plaintiffs represented that they controlled the advertising of the principal department stores in Portland through their connections and influence, and that the defendant would receive in the future from each of said stores not less than the amount of advertising theretofore received by The Telegram; and

"Third, that the plaintiffs fraudulently represented that The Telegram's business and operations had theretofore been profitable."

The cause was submitted to a jury and a verdict returned in favor of defendant for $380,000. On motion of the plaintiffs, the trial court, Honorable Hall S. Lusk, now a member of this court, presiding, set aside the verdict and granted a new trial for the reason that it had erroneously submitted for the consideration of the jury the alleged fraudulent representations concerning the Barde lease. The trial court held that there was no substantial evidence tending to show that the defendant was misled or deceived by any representation of the plaintiffs concerning the alleged non-existence of the lease.

To comprehend the issue of fraud, it is well at this juncture to make a brief statement of the factual situation including the historical background of this transaction.

The Telegram Publishing Company, in 1921, was and for some years prior thereto had been publishing in Portland a daily newspaper known as the Portland Telegram. On December 3, 1921, The Telegram Publishing Company entered into an agreement with Rose Barde and other members of the Barde family whereby the Bardes leased to The Telegram Publishing Company a tract of land at the corner of Eleventh and Washington streets in the city of Portland and the lessors agreed to erect thereon a building estimated at the time

of signing the agreement to cost approximately $100,-000, which building was to be used by The Telegram Publishing Company in its business of publishing the Portland Telegram. By this agreement the property was leased for a period of 25 years at an estimated rental value of $24,000 a year. The actual amount paid as rental was to be, for the first 10 years of the lease, 8 per cent of the value of the land fixed at $200,000, and 8 per cent of the cost to the Bardes of erecting the building.

Early in the year 1927, The Telegram Publishing Company went into bankruptcy, but the trustee continued publication of the newspaper until all the assets of the bankrupt company were sold in June of that year to David E. Lofgren, as undisclosed trustee for Herbert Fleishhacker, for the sum of $226,000. Prior to this sale, the trustee in bankruptcy had received, according to the order of the referee, a bid of $178,000, from the defendant, The Portland News Publishing Company. The report of the trustee in bankruptcy discloses that he advertised for sale, "all property belonging to the estate of said bankrupt, which includes the entire physical property inclusive of printing plant, contracts, franchises, good will, *leases,* accounts receivable, etc., all situate in the Telegram building, 11th and Washington streets, Portland, Oregon." (Italics ours.)

After transfer of the property and assignment of the lease to the purchaser at bankruptcy sale, Fleishhacker at once caused to be incorporated The Portland Telegram, Inc., and began negotiations for modification of the Barde lease. On August 31, 1927, a contract was entered into substantially reducing the rentals and permitting the lessee to make certain alterations in the building. Otherwise, the lessee assumed all the obligations of the original Barde lease executed in 1921. In

the four-year period between 1927 and 1931—the latter date being the time of purchase by defendant—the Telegram doubled its circulation and received advertising revenues approximating $500,000 a year.

In March, 1931, the defendant, through its executive officers, entered into negotiations with the plaintiffs for the purchase of the Telegram, an evening paper in competition with the Portland News. These negotiations were initiated by Mr. Redhead, formerly business manager of the Telegram, who went to Seattle and made an offer to B. H. Canfield, chairman of defendant's board of directors, to sell the Telegram for $750,000. Negotiations continued during March and April, 1931, in which Fleishhacker and Brockhagen, representing the Portland Telegram, participated together with Canfield; R. J. Benjamin, northwest editorial director of the Scripps-Canfield chain of newspapers; E. W. Scripps, treasurer; and Dan Powers, attorney—all representing defendant company.

As a result of various meetings and extended negotiations, a memorandum agreement was entered into on May 4, 1931, in the city of Portland, whereby the defendant company agreed to purchase all the capital stock of the Portland Telegram for the sum of $750,000. The formal contract, however, closing the deal—in some particulars materially different from the memorandum agreement—was not executed until May 25, 1931. In this formal contract of purchase, the defendant company, among other things, agreed "to assume all liabilities of The Portland Telegram shown on its books of account as of the close of business on May 4, 1931, including taxes, and all liabilities whatsoever of third party and/or first parties under that certain Indenture of Lease dated December 3, 1921, by and between Rose Barde et al. as lessors, and The Telegram Publishing

Company, a corporation, as lessee, *and under all assignments thereof and agreements supplementary thereto,* which said lease is of that certain building heretofore used and occupied by The Portland Telegram and known and described as No. 421 Washington Street, Portland, Oregon.'' (Italics ours.)

The memorandum agreement was executed on May 4, 1931, and, on the following day, the defendant company took possession of the leased premises and began publication of its newspaper. It paid a monthly rental of $1,816.66 for May and June, 1931, in accordance with the rental charge as specified in the modified lease dated August 31, 1927. In September, 1931, Rose Barde et al. brought action against the defendant Portland News Publishing Co. to recover rent. In that action defendant denied liability under the lease for the reason that there was no privity of estate between it, as lessee's assignee, and the lessor, but this court on appeal held adversely to defendant, in that through the conduct of the parties there had been effected a legal assignment of the lease and therefore a privity of estate. (*Barde v. Portland News Publishing Co.,* 145 Or. 376 (26 P. (2d) 787, 28 P. (2d) 216). Again Rose Barde et al., in June 1932, and March, 1933, commenced actions to recover for rental due from defendant. In these cases, consolidated on appeal, the defendant sought to avoid liability under the lease by reason of having made an assignment thereof to Louis Groman on August 1, 1932. This court on appeal (*Barde v. Portland News Publishing Co.,* 152 Or. 77 (52 P. (2d) 194)) held that the reassignment of the lease by the assignee did not terminate the lease. It was therein said by the court that:

''The specific assumption by the defendant of all liabilities under the lease of Fleishhacker, Brockhagen and the Portland Telegram, accompanied as it was by

the defendant's receipt of the capital stock and assets of the Portland Telegram, in part consideration of its said promise to assume such liabilities * * * makes the defendant liable for the payment of the rent and entitles the plaintiffs, although strangers to the contract, to maintain an action therefor.''

In the instant action, in which fraud for the first time is alleged, the defendant by its counter-claim does not question its liability under the lease, but affirms the contract and demands damages for the difference between the actual value of the property purchased and the purchase price thereof.

■■ The vital question on this appeal is whether there is any substantial evidence tending to show that the defendant, at the time of execution of formal contract of purchase on May 25, 1931, had knowledge of the Barde lease. It is elementary that one of the essential elements of fraud is that the party to whom the alleged fraudulent representations were made relied upon the same and was deceived thereby. Of course, if defendant, through its agents acting within the scope of their authority, knew of the existence of the Barde lease at the time of the contract of purchase, it could not have been misled or deceived by any representation as to the non-existence of such lease. Whether the defendant did have such knowledge of the lease would be an issue of fact for the determination of the jury if different reasonable inferences relative thereto could be drawn from the evidence. If, however, the only reasonable deduction from the evidence is that defendant did know of the Barde lease at the time it entered into the contract, the court should declare as a matter of law that defendant could not prevail on such issue.

■■ The court is not unmindful that a jury is not obliged to give full faith and credit to the testimony of

witnesses, even though uncontradicted, if such evidence is improbable or, by its nature or character, is unworthy of belief by reasonable-minded persons: *Rivers Bros. v. C. F. T. Company, Inc.,* 124 Or. 157 (264 P. 368). A jury, however, cannot arbitrarily or capriciously disregard undisputed evidence which is not unreasonable nor improbable. The rule is thus stated in *Ford v. Schall,* 114 Or. 688 (236 P. 745), and quoted with approval in *Nicolai-Neppach Co. v. Smith,* 154 Or. 450 (58 P. (2d) 1016, 60 P. (2d) 979, 107 A. L. R. 1124):

"The evidence may be undisputed, but it is a question for the jury if, as stated in Koontz v. Oregon R. & N. Co., 20 Or. 21 (23 Pac. 820), and cited with approval in Graham v. Coos Bay R. & N. Co., 71 Or. 393 (139 Pac. 337), men of reasonable minds might draw different conclusions from the facts proved. Jurors, however, are not permitted in the face of uncontradicted testimony, to enter the realm of speculation or to indulge in frivolous and captious objections thereto. Only reasonable inferences may be drawn from facts proved."

If the law were otherwise, there could never be a directed verdict based upon undisputed testimony.

■ Applying these fundamental principles, the court is of the opinion that the only reasonable deduction to be drawn from the record is that the defendant, through its executive officers and its attorney, knew of the existence of the Barde lease and, therefore, could not have been misled or deceived by any representations in reference to its alleged non-existence.

Mr. Scripps, treasurer of the defendant corporation, and the only person to whom any fraudulent representations are claimed to have been made, testified that Fleishhacker said: "* * * if there had been any (lease) it was wiped out when the property went through bankruptcy." Yet the record shows without dispute that when the Telegram Company acquired the

property—including the lease on the Telegram building which was assigned to it—from the trustee in bankruptcy in 1927, the defendant Portland News Publishing Company was an unsuccessful bidder at such sale. How then can it reasonably be said that the defendant relied upon any representation that the Barde lease was "wiped out" in the bankruptcy proceeding? If the defendant really believed it had been thus "wiped out" did it not think it strange that the contract contained the clause wherein the defendant expressly agreed to assume all liabilities under the Barde lease, dated December 3, 1921, and "all assignments thereof and agreements supplementary thereto"? What reason could there have been for any reference in the contract to the Barde lease if it had been "wiped out" in the bankruptcy proceeding? Scripps, who played a leading part in closing the deal, admits that he discussed the assumption of liability clause with his attorney, Dan Powers, and that "Mr. Powers said it was all right to sign that in so far as we had agreed on the total limit of our liability, and that, as he said, would not change in any way the main agreement signed on May 4th." Scripps further testified that Mr. Kent, attorney for the plaintiffs, told him that such assumption of liability clause was nothing more than "clarifying the arrangement that I (Scripps) had with Mr. Fleishhacker in which we agreed to pay the rent during such time as we occupied the building." This explanation of Scripps is entirely unreasonable and contradicts the plain language of the instrument which was knowingly executed.

Mr. Brockhagen testified that Benjamin came to San Francisco in March, 1931, to see Fleishhacker and him about purchasing the Telegram and "wanted to know about the terms, and how much would be paid and he * * * wanted to *investigate the lease* a little

further there." Brockhagen said he told Benjamin "Of course, Mr. Benjamin, you can't buy this newspaper without buying that lease, because Fleishhacker and myself under no consideration will sell this paper unless some one takes the lease.   *   *   *   You could readily appreciate our selling a paper and having to move out of there and consolidating it with the News, and leaving us with a whole building here on our hands for fifteen years at $1,816 a month. We would just simply be crazy if we considered that."

██ Redhead testified that, in the latter part of April, 1931, he discussed the provisions of the lease with R. J. Benjamin, who had accompanied him on a trip from Seattle where Redhead had been to consult with Canfield, chairman of the board of directors, in reference to sale of property. Redhead said: "It was the latter end of April   *   *   *   because the deal was consummated shortly after that. And in discussing this arbitration clause in the lease I said that I would bring it down the next day. So I got the lease from the office and took it down and read the arbitration clause and we also looked at the modification of the lease * * *."
Redhead further testified:

"Q. That is you read it to him?
"A. To Mr. Benjamin.
"Q. Where?
"A. In the lobby of the Benson hotel."

Benjamin was not called as a witness and this testimony of Redhead and Brockhagen that Benjamin knew about the lease stands uncontradicted. It is true that Benjamin ordinarily acted in an editorial capacity but, in these instances, he was acting for and on behalf of his company for the purpose of negotiating a deal with the plaintiffs for the purchase of the Telegram. Therefore, any knowledge which he acquired concerning

the existence of the Barde lease, while acting within the scope of his authority, would be imputed to his principal, the defendant company. This fundamental principle is thus stated in Thompson on Corporations (Vol. 3) 323:

"It may be said generally that notice to the officer or agent of a corporation in due course of his employment in respect to a matter within the scope of his authority or apparent authority, of such character that it becomes his duty to communicate the information to it, is notice to the corporation whether the officer or agent imparts to it such information or not."

Also, to the same effect, see *Dillard v. Olalla Min. Co.*, 52 Or. 126 (94 P. 966, 96 P. 678).

Brockhagen also testified, without contradiction, that on April 22, 1931, he turned over a copy of the Barde lease to Dan Powers, attorney for the defendant, that at such time Powers said "he wanted to look into the terms of that lease, he wanted to study it thoroughly, so I gave him the lease." Powers was not a witness in the case. Why was he not called to refute this testimony if it was not the truth? It is idle to talk about the plaintiffs' calling him as a witness in reference to such matter.

■ There is no reasonable doubt that Powers was acting as attorney for the defendant company in closing this deal. He was in attendance at many meetings of the principals. Scripps testified in reference thereto:

"Q. So the first you knew of this deal is when you met Mr. Fleishhacker and Mr. Brockhagen in Portland, is that right, and you don't know just who arranged the meeting? A. I said that Mr. Canfield arranged the meeting.

"Q. Now, wasn't Mr. Benjamin with you at that meeting on May 3rd and May 4th? A. Mr. Benjamin was present at one or two of those discussions. I had

a number of my men, that is, executives and managers in our concern, present to give me advice on it, I didn't * * *

"Q. Yes—you had your attorney there all the time, didn't you, Mr. Powers? A. Well, Mr. Powers, I don't think he was there all the time, no.

"Q. Well, he was in on the negotiations, wasn't he? A. *Mr. Powers looked over the papers and approved them.*"

Further, Mr. Scripps testified on cross-examination:

"Q. And who was your attorney in Portland? A. Mr. Powers was our attorney in Portland.

"Q. And he was acting as your attorney in this transaction for the purchase of the Telegram, was he not? A. Yes."

Hence, we may well conclude that whatever knowledge Powers, as attorney, had in reference to the Barde lease while acting within the scope of his employment would likewise be imputed to the defendant.

Mr. John C. Veatch, an attorney at law, testified that Brockhagen, Fleishhacker, Scripps, Benjamin and Powers came to his law office in the city of Portland shortly prior to the execution of the memorandum agreement of May 4, 1931, and "wanted to have an agreement drawn up covering the sale" and that at such meeting the terms and conditions of the Barde lease were discussed. Mr. Scripps, however, denies having heard any reference to the lease. Hence, it may well be argued that, in reference to this testimony standing alone, an issue of fact would be presented. It is a matter, however, that should be considered in determining whether the record, in its entirety, shows beyond reasonable controversy that the defendant had actual knowledge of the existence of the Barde lease.

As a further indication of actual knowledge of the existence of the Barde lease, it appears without dispute

that there was in the possession of defendant, during the three-week period prior to the formal execution of the contract, the minute book of the Telegram Company showing the adoption of resolutions authorizing the execution of the Barde lease modification of August 31, 1927, by which the Telegram Company became the lessee under the terms of the original Barde lease as modified. It is uncontradicted that Mr. Powers, during such period, examined the minute book. Mr. Scripps admitted that Powers had examined such corporate record and that he, himself, had looked at the same but not "very carefully" and that he had seen no reference therein to the Barde lease. Attention is also directed to the balance sheet of the Portland Telegram as of April 30, 1931, in possession of defendant's agents prior to purchase, plainly indicating the existence of the lease since there is listed therein, under the head of "Fixed Assets" an item of "Leasehold Improvements, $2,968.36."

On May 4, 1931, the Morning Oregonian carried a first page article announcing the purchase by defendant of the Telegram, part of the same being as follows:

"Previous negotiations looking to a sale of the Telegram to the News some time ago had come to naught. The chief obstacle then, according to reports in newspaper circles, was the lease of the Telegram Building, which the owners desired to dispose of along with the newspaper property and which the News declined to take over, having its own building at Fifth and Main Streets. In the renewed negotiations, now said to have been brought near, if not quite to fruition, the disposal of this question was not made known."

It is more than passing strange that the Oregonian knew of the Barde lease, but the defendant newspaper did not.

Mr. Roscoe Nelson, an attorney of high repute, now deceased, and who represented the Barde interests, testified, in substance, that on the day the contract was formally executed, May 25, 1931, Mr. Scripps and Mr. Powers called at his office in the city of Portland and, at such time, he discussed with them the terms of the Barde lease and that, later in the day, he sent over to Powers' law office six copies of the supplemental lease. The following memorandum, made in the office of Mr. Nelson, corroborates his testimony:

"Legal Service Memorandum, Dey, Hampson & Nelson, May 25, 1931. Nature of Service: Conference with Mr. Powers * * *." "Nature of Service, preparing six copies of agreement to reduce rental on Telegram building, executed August 31, 1927, between Rose Barde, et al and The Telegram Publishing Company, and delivery same to Mr. Powers."

Why did Powers and Scripps go to Mr. Nelson's law office unless it was to inquire about the Barde lease? Mr. Scripps testified that he thought such meeting occurred some time in the early part of September, 1931, or after the sale was made, but a letter of Mr. Nelson to the defendant on July 11, 1931, would indicate that Mr. Scripps is mistaken as to the time of this meeting. In this letter, Mr. Nelson, among other things, says:

"*As indicated by me verbally to Mr. Scripps and Mr. Powers at the time of their call,* there was, of course, no objection whatsoever on the part of the owners of this building to your succeeding to the interests of the Portland Telegram, but we have been desirous of having something formal, in view of what I may characterize, without any intention to be offensive, to evasiveness in regard to the precise nature of the transaction insofar as it affects the leasehold interests." (Italics ours.)

Finally, aside from the legal question as to whether fraud can be based on a representation inconsistent

with and contradictory to the terms of an instrument knowingly executed, it would seem that the contract of purchase entered into on the 25th day of May, 1931, reciting in plain and unambiguous language the assumption of liability under the Barde lease, and its assignments and supplements thereto, would make it difficult to mislead or deceive any reasonable-minded person by any representation concerning the non-existence of the lease. If A, who is dealing at arm's length with B, enters into a written contract to sell Blackacres to B, stipulating therein that B agrees to assume and pay a certain mortgage, could B later reasonably assert that he was misled and deceived by the representation of A that the property was not encumbered by a mortgage? The very instrument itself would negative such contention.

Viewing the record in its entirety in the light most favorable to defendant, as we must do on this appeal, we are convinced that the only reasonable deduction therefrom is that the defendant, through its executive officers and attorney, had actual knowledge of the existence of the Barde lease, as modified, at the time it entered into the contract. Hence, defendant cannot, as a matter of law, assert that it was misled or deceived by any representation of the plaintiffs concerning the alleged non-existence of the lease. Since the trial court erred in submitting such issue to the jury—and there are no other errors in the record—it follows that the order granting a new trial must be sustained.

We think the defendant established a case for submission to the jury as to the other allegations of fraud—viz, as to control of advertising and as to whether the business was being operated at a profit.

Judgment is affirmed.

BEAN, C. J., and ROSSMAN, J., concur.

KELLY and LUSK, JJ., not participating.

BAILEY, J. (dissenting). In presenting this dissenting opinion it becomes necessary to set forth in detail the facts in the case which appear important and determinative, in order to give an adequate exposition of the law applicable to the negotiations between the parties to this litigation.

This action was instituted by the plaintiffs to recover from the defendant the sum of $46,342.72 and interest thereon from the date of payment of the principal sum by the plaintiffs in satisfaction of a judgment recovered against them in a creditors' suit brought in the United States district court for the northern district of California, southern division, by Rose Barde and others. The recovery sought by the plaintiffs is based on the provisions of an original and a supplemental contract entered into by the plaintiffs and the defendant in May, 1931, whereby the plaintiffs sold to the defendant all the capital stock of The Portland Telegram, a corporation, and its assets, for the sum of $750,000.

The particular provision on which the plaintiffs principally rely is contained in the supplemental contract of May 25, 1931, and by it the defendant covenanted and agreed "to assume all liabilities of The Portland Telegram shown on its books of account as of the close of business on May 4, 1931, including taxes, and all liabilities whatsoever of third party [The Portland Telegram] and/or first parties [Fleishhacker and Brockhagen] under that certain indenture of lease dated December 3, 1921, by and between Rose Barde et al. as lessors, and The Telegram Publishing Company, a corporation, as lessee, and under all assignments thereof and agreements supplementary thereto, which said lease is of that certain building heretofore used and occupied by The Portland Telegram and known and described as No. 421 Washington street,

Portland, Oregon." The amount recovered against the plaintiffs in the United States district court in California, for which recovery is here sought from the present defendant, was for past-due rents, with interest thereon, on the property mentioned in the foregoing clause of the May 25 agreement.

The defendant in its amended answer to the plaintiffs' complaint pleaded a counter-claim, alleging that the defendant was induced to purchase from the plaintiffs the capital stock and assets of The Portland Telegram by the plaintiffs' fraudulent representations as to certain material facts concerning the value of the property, and other matters relating to it. Concisely stated, the fraud charged consisted in: (1) the false representation that The Portland Telegram was operating at a profit, whereas in fact it was operating at a loss of more than $70,000 a year; (2) the false representation that plaintiffs through their influence and connections controlled the department store advertising carried in the Telegram and that plaintiffs could and would see that this advertising would be retained by the defendant after the purchase, whereas in fact the plaintiffs did not control such advertising and could not, and did not then intend to, make sure that the defendant would receive said advertising in the future, and after the purchase of the Telegram such advertising was materially reduced, with the acquiescence of the plaintiffs and without any attempt on their part to prevent such reduction; and (3) the false representation that The Portland Telegram was occupying the Telegram building "under a month to month tenancy and that it had not executed any writing or agreement, or otherwise bound itself in any way whereby it was obligated to pay rental of said premises after it should cease to occupy said premises," whereas in fact the Barde lease

had been revived and its obligations had been assumed by means of a new agreement made by The Portland Telegram subsequent to the bankruptcy of The Telegram Publishing Company.

To the defendant's answer containing the above-mentioned counter-claim, the plaintiffs filed a reply, denying all the allegations as to misrepresentations and affirmatively alleging that on May 5, 1931, the defendant took possession of all the physical properties, books and accounts of The Portland Telegram and that prior to May 25, 1931, the defendant had full knowledge of the financial condition of The Portland Telegram, also of the fact that there was then in existence in full force and effect a long-term lease on the Telegram building and premises, and of all the other facts alleged in the counter-claim as fraudulent representations made by the plaintiffs; and that with full knowledge of all such facts the defendant entered into the contract of May 25, 1931, and thereafter executed and delivered to the plaintiffs bonds in the sum of $485,000 and discharged other obligations, and by reason of such facts the defendant "is estopped and waived any right which it may have had to assert that it had been defrauded by plaintiffs, or that plaintiffs had misrepresented any fact alleged in the amended counter-claim."

The cause was tried before the court and a jury, and a verdict was returned in favor of the defendant in the sum of $380,000. Thereupon a motion for a new trial was filed by the plaintiffs, with grounds therefor stated as follows: (1) insufficiency of the evidence to justify the verdict; (2) errors in law occurring at the trial and excepted to by plaintiffs; and (3) excessive damages, appearing to have been given under the influence of passion or prejudice. The specification of points relied

upon by plaintiffs in their motion for a new trial was set forth as follows:

"1. The evidence received upon the trial of the action was insufficient to support the verdict, and the verdict is against the law in that the evidence failed to make a *prima facie* case to be submitted to the jury upon the counter-claim; and in that there was no evidence tending to prove that the defendant relied upon any of the alleged misrepresentations or was deceived thereby, or sustained any damage on account thereof; but the undisputed evidence showed that defendant did not rely upon and was not deceived or damaged by any of the alleged acts of misrepresentation.

"2. The court erred as follows:

"(a) In denying plaintiffs' motion to direct a verdict in their favor for the amount demanded in their complaint;

"(b) In denying plaintiffs' motion to withdraw from consideration by the jury the issue of alleged misrepresentation as to the non-existence of a lease upon the Telegram building;

"(c) In denying plaintiffs' motion to withdraw from consideration by the jury the issue of alleged misrepresentation as to the profitableness of the operations of The Portland Telegram;

"(d) In denying plaintiffs' motion to withdraw from consideration by the jury the issue of alleged misrepresentation as to advertising to be secured upon the consolidation of The Telegram and The News;

"(e) In refusing to give instructions Nos. 4, 11 and 12, as requested by plaintiffs;

"(f) In giving instruction No. 5 requested by defendant as modified.

"(g) In giving instruction No. 6 requested by defendant as modified.

"3. The damages awarded by the verdict are excessive and appear to have been given under the influence of passion or prejudice."

The trial court granted the plaintiffs' motion without specifying in its order the ground on which the

motion was allowed. There is included, however, in the bill of exceptions a stenographic report of the decision of the trial judge as rendered from the bench at the time the motion for a new trial was granted, in which the only ground stated for allowing a new trial was that, "it was error not to withdraw from the jury the issue of fraudulent statements as to the character of the Telegram's occupancy of the building, because the record conclusively shows that the defendant corporation was charged with knowledge of the terms of the Barde lease and the supplementary agreement of September 1, 1927, at the time that defendant executed the agreement of May 25th, 1931." Regardless of the reason stated by the trial court in granting a new trial, the order appealed from should be affirmed if a new trial should have been granted for any of the other reasons specified in plaintiffs' motion.

This appeal presents questions both of law and of fact and therefore it is necessary to set forth the facts as disclosed by the record. The Telegram Publishing Company in 1921 was, and for some years prior thereto had been, publishing in Portland a daily newspaper known as The Portland Telegram. On or about December 3, 1921, The Telegram Publishing Company entered into an agreement with Rose Barde and other members of the Barde family whereby the Bardes leased to The Telegram Publishing Company a tract of land at the corner of Eleventh and Washington streets in the city of Portland and the lessors agreed to erect thereon a building estimated at the time of signing the agreement to cost in the neighborhood of $100,000, which building was to be used by The Telegram Publishing Company in its business of publishing The Portland Telegram. By this agreement the property was leased for a period of 25 years at an estimated rental value of

$24,000 a year. The actual amount to be paid as rental was to be, for the first 10 years of the lease, 8 per cent of the value of the land fixed at $200,000 and 8 per cent of the cost to the Bardes of erecting the building. In addition to the rental the lessee was to pay the taxes on the property, the upkeep of the building and the cost of insurance on the building. The cost of the completed building was somewhat in excess of $100,000, which accordingly increased the annual rental beyond the estimated $24,000.

The agreement further provided that at the end of the first 10 years of the leasing period and at the end of each five years thereafter the value of the real property separate and apart from the building should be reappraised and the annual rental readjusted accordingly, on a basis of 8 per cent of the value of the land at that time, plus 8 per cent of the original cost of the building.

Early in the year 1927 The Telegram Publishing Company went into bankruptcy, but the trustee in bankruptcy continued publication of the newspaper until all the assets of the bankrupt company were sold in June of that year to David E. Lofgren as undisclosed trustee for Herbert Fleishhacker, for the sum of $226,000. Prior to this sale the trustee in bankruptcy had received, according to the order of the referee, a bid of $178,000 from the defendant, The Portland News Publishing Company.

The plaintiff Fleishhacker, according to his testimony, was in New York in the early part of June, 1927, and was then asked by William Randolph Hearst, the head of the Hearst newspapers, to purchase the assets of The Telegram Publishing Company for Hearst at a price not over $300,000. Acting upon this request, Fleishhacker instructed Robert E. Smith of

Portland, president of the American National Bank of that city, a man whom he did not personally know, to endeavor to purchase the assets of the publishing company within the limit fixed by Hearst. A few days later Hearst notified Fleishhacker that he did not care to go ahead with the purchase of The Portland Telegram, and when Fleishhacker notified Smith to drop negotiations the deal had already been consummated and Fleishhacker found himself with the newspaper on his hands. Even then, he says, he did not inform Hearst that the newspaper had been purchased before Hearst's order was countermanded.

Without any specific instruction from Fleishhacker, Smith, with Lofgren and Travis, the latter of whom had been connected with the Telegram, incorporated The Portland Telegram under the laws of the state of Oregon, with a capitalization of 5,000 shares of the par value of one hundred dollars a share. The three incorporators subscribed for one-half of the capital stock. The assets purchased by Lofgren, including an assignment of the Barde lease, were thereupon transferred to the new corporation.

At some time prior to August 31, 1927, certain business interests in the city of Portland became much perturbed over the rumor that Hearst was contemplating buying The Portland Telegram, and Roscoe C. Nelson, attorney for the Bardes, was urged not to recognize the assignment of the Barde lease to the purchaser of the assets of The Telegram Publishing Company until it was definitely determined that Hearst interests were not behind the purchase of the paper. Mr. Nelson thereupon made an investigation and in order to have the newspaper retained by Fleishhacker, took it upon himself to procure a large amount of advertising for the purchasers of the newspaper, from

business firms in Portland opposed to the Hearst interests.

After Mr. Nelson had obtained that advertising for the Telegram and had been advised by those in charge of the paper that Fleishhacker had not purchased the newspaper for Hearst, the Bardes and The Portland Telegram executed an agreement under date of August 31, 1927, whereby The Portland Telegram assumed all the obligations of the former lessee, The Telegram Publishing Company, in connection with the lease of December 3, 1921, with the following exceptions: in this agreement the yearly rental which had been paid by The Telegram Publishing Company was reduced $4,200 for each of the remaining years of the first ten-year period of the lease, which reduction was "accomplished by changing the base value of $200,000 for the land wherein the Telegram building is erected to $147,-500," and by granting to The Portland Telegram the right to make any physical changes that it might desire in the leased building, provided said changes would not impair the value of the building. The monthly rental paid under this new or supplemental agreement was $1,816.33.

According to the story told by the plaintiff Brockhagen, while that plaintiff was in Sacramento, California, in charge of a newspaper published there, he was requested by Fleishhacker on August 30, 1927, to meet Fleishhacker at Davis, California, on that date and accompany him by train to Portland, Oregon, where they were to buy a newspaper. Fleishhacker advised him on the train that they were to acquire all the stock in the corporation owning the newspaper, but did not tell him how much they were to pay for the stock or from whom they were to buy it. Brockhagen did not then know, he testified, nor had he learned

even at the time of the trial, that Fleishhacker was interested in The Portland Telegram before September 1, 1927.

Without examining the minute books of The Portland Telegram or any of its records, without knowledge that the Barde lease had been assumed by the new corporation, and without having any idea as to the value of the property of The Portland Telegram, Brockhagen, according to his own testimony, on or about September 1, 1927, purchased for $50,000, 22 per cent of the capital stock of The Portland Telegram. In explaining the purchase of that stock he testified: "Well, I think I got that fifty thousand dollars' worth of stock that was in my name of L. R. Wheeler, I got Travis's stock, and I took the stock up from the employes, I think that took care of my twenty-two per cent, that was all I had in the paper, was twenty-two per cent—I acquired the stock from the employes after I assumed the management of the paper, I got them together and told them, 'This paper is going to be in red ink for some time, and we are going to build it up, and you boys will be assessed on your stock.' " Further on in his testimony Brockhagen stated that he purchased the stock on the last day of August or the first day of September, 1927, and that the purchase was made in Smith's office in the American National Bank, where Brockhagen and Fleishhacker had gone upon arriving in Portland; that the stock he purchased was represented by a certificate made out in the name of L. R. Wheeler, which had been properly endorsed and was in Smith's office when he arrived there; that he did not meet Wheeler in the negotiations for the purchase of the stock and did not know who received the money which he paid for the stock; and that he did not know how much Flieshhacker paid for his stock. In

referring to the purchase of Brockhagen's stock, Fleishhacker testified that he had sold an interest to Brockhagen and received the money which Brockhagen paid for the stock. He stated, "I imagine unless the man [Brockhagen] was crazy, he knew it was going to me, I sold him an interest in the paper."

From September 1, 1927, when the stock in The Portland Telegram was taken over by Fleishhacker and Brockhagen, until May 5, 1931, when the defendant took over the paper, Brockhagen was in complete charge of The Portland Telegram. He was also, during a large part of the time, in charge of the management of a Sacramento paper and of the San Francisco Bulletin after Fleishhacker acquired a controlling interest in it.

While Brockhagen was managing The Portland Telegram the newspaper operated at an annual loss. For the year ending May 1, 1931, "it operated at a loss of $79,400.52, if there is eliminated from the accounting a write-up of assets which occurred in the month of December, 1930, and in April, 1931." In December, 1930, the "machinery was written up $45,018.56,—circulation and good will were written up $500,000, Associated Press membership was written up $50,000." In April, 1931, the Associated Press membership was written up an additional $50,000 so that it was given a total valuation of $100,000. Prior to the write-up of December, 1930, no value had been placed on the newspaper's circulation and good will or its Associated Press membership. For December, 1930, on the basis of including the write-up of assets as above stated, the books of the company showed a profit of $584,748.44. By eliminating the amount of write-up of assets in December, there was a loss that month in excess of $10,000. For each month of the year ending May 1, 1931, if the write-up of assets be excluded, there was an

operating loss, with the exception of the month of March, which showed a profit of $431.72. The month of April, 1931, showed an operating loss in excess of $18,000, if the additional write-up of assets in that month be left out of the computation.

In 1931, during negotiations which will hereinafter be discussed, Mrs. Josephine Scripps, a widow, and her two sons and two daughters owned the majority of the stock of The Portland News Publishing Company and in addition owned a controlling interest in the Scripps Newspaper Company and its other subsidiaries, Pacific coast newspapers in the Scripps-Canfield chain. B. H. Canfield, the owner of 12½ per cent of the stock of The Portland News Publishing Company, lived in Seattle and was chairman of the board of directors of that company and of the Scripps Newspaper Company. He was in charge of what was referred to as the northwest branch office of the latter company, which was maintained in Seattle. E. W. Scripps, a son of Mrs. Josephine Scripps, was 21 years of age in May, 1930. He owned 10 shares of the stock of The Portland News Publishing Company, was treasurer of that company and lived in Oakland, California, where was located the head office of the Scripps Newspaper Company. Harry Ely, the owner of one share of stock in The Portland News Publishing Company, resided in Portland and was the president of that company. R. J. Benjamin owned 10 shares, or 1 per cent, of the stock of the defendant corporation and was serving the Scripps Newspaper Company in an editorial capacity. He does not appear to have been a director or officer of the defendant corporation or of the Scripps Newspaper Company.

Judge Curts had been for a number of years until his death in 1930 the general counsel of the Scripps

interests, which included the Scripps Newspaper Company and the various Scripps-Canfield newspapers. From the time of his death the Scripps interests had no general counsel until the appointment of S. S. Hahn in June, 1931.

Will Redhead, a brother-in-law of Brockhagen, in the fall of 1930 left the employ of The Portland Telegram after having been with that newspaper for three years, the latter part of that time as manager. In January, 1931, he induced Brockhagen to permit him to act as a broker in the sale of the stock and assets of The Portland Telegram. The price of the newspaper as given by Brockhagen to him was $750,-000, with a commission of $7,500 to Redhead.

Early in March, 1931, Redhead interviewed Canfield in the latter's hotel in Seattle, with a view of interesting him in the purchase of The Portland Telegram by the Scripps Newspaper Company or by the defendant. At that time, according to some of the testimony in the record, Canfield was not in good health and spent very little time in the office of that company in Seattle. He died in 1932. Redhead, however, in his testimony stated that Canfield was apparently in good health and was very much interested in purchasing the Telegram.

At no time during his contacts with Canfield did Redhead, according to his statement, have with him any balance sheets or other financial reports showing the earnings of the paper, nor had he seen any since leaving the Telegram's employ. He did not know and did not attempt to ascertain whether the newspaper was operating at a profit or a loss. In this connection, he testified: "During the negotiations with Canfield the matter of profits and returns was never mentioned, we didn't discuss that." He did tell Canfield, he says,

that "all the details he wanted he could get from the office in Portland, right straight from the books." And, he testified, he emphasized very strongly the fact that the purchaser of the Telegram would have to assume the long-term Barde lease, which involved, he explained to Canfield, undertaking an obligation to pay in excess of $400,000 in rentals, upkeep and insurance of the Telegram building for the unexpired term of the lease. The taxes were about $6,000 a year. The question of the amount thereof was not discussed with Canfield. Redhead further stated to Canfield, he says, that the Portland Journal had made an offer of $650,000 for the Telegram, and that the only reason why the Journal wanted to buy the paper was to acquire the Associated Press membership, for which alone it was willing to pay $250,000; and the sale of that membership to the Journal at that figure would greatly reduce the burden of assuming the lease of the Telegram building.

On Redhead's first trip to Seattle he saw Canfield on two successive days and on the second day Canfield told him that he had consulted his associates and "the proposition looked all right," and that he would come down to Portland. Within 10 days or two weeks thereafter Benjamin came to Portland and first consulted with Brockhagen. Benjamin stayed in Portland about two days and after his consultation with Brockhagen, Redhead saw him and discussed with him in general the purchase of the Telegram.

Before Redhead's second trip to Seattle, which was in April, 1931, Benjamin had visited Brockhagen and Fleishhacker in San Francisco and the price of the paper had been raised to $850,000. Through Redhead's efforts with Brockhagen the price was then reduced to $750,000.

Redhead returned to Portland from his second trip to Seattle with Benjamin, in the latter's car. Benjamin was "quite elated about the deal." With reference to discussion of the lease on the way to Portland, Redhead testified: "We spoke of the lease, and I mentioned the arbitration clause; you know there is an arbitration clause and at the end of 10 years they would arbitrate and fix the valuation, and he said he had overlooked that part of it." Later, with reference to the time when Benjamin accompanied him to Portland, Redhead said: "It was the latter end of April, towards the end of April, because the deal was consummated just shortly after that. And in discussing this arbitration clause in the lease, I said that I would bring it down to him the next day. So I got the lease from the office and took it down, and read the arbitration clause, and we also looked at the modification of the lease, that part that is at the back of it." Further testimony of Redhead on this subject was as follows:

"Q. That is, you read it to him? A. To Mr. Benjamin. Q. Where? A. In the lobby of the Benson hotel. Q. When? A. In the latter end of April.

"Q. Anybody else present? A. Not to hear it, to know what I said. Mr. Ely was in the offing, just floating around, but whether he knew what I was doing or not, I cannot say.

"Q. Was Mr. Ely in the conference with you? A. Oh, no. Q. Was he in the lobby just by accident, or . . . A. He was in the lobby writing,—I think he had come downstairs with Mr. Benjamin, I think they had been together.

"Q. But you didn't show the lease to Mr. Ely? A. No."

Redhead further testified that he did not make any progress or come to any agreement with Mr. Benjamin and that he, Redhead, "looked to Canfield as the prin-

cipal," but "discussed the details with Mr. Benjamin." In answer to the question, "Did you know whether or not they had reached any agreement on the sale before the May fourth meeting," Redhead answered, "No, they were negotiating, that was all that I knew." He also testified as follows:

"Q. If I understand your version of this clearly, you and Mr. Canfield really made this deal? A. Yes. Q. And that is the reason they paid you seventy-five hundred dollars commission? A. Yes.

"Q. When Mr. Scripps and Mr. Brockhagen got together, was . . . what was the purpose of their getting together to make the deal? A. To sign up the final papers and look into any little detail that was necessary. Q. In other words, the controlling stockholders left it to you and Mr. Canfield to make the deal, and they just got together to sign the papers, is that right? A. Practically. Q. That is practically it? A. Yes."

When asked whether he was attempting to sell the capital stock of The Portland Telegram or the assets of the paper to Canfield, Redhead stated that they did not discuss the stock except that Canfield asked and was informed by Redhead that the stock was owned by Fleishhacker and Brockhagen. Redhead was specifically asked, "But when you were talking to Mr. Canfield on this sale, what was it you were purporting to sell to him, the stock or the physical assets of the paper?" His answer was, "The physical assets, the paper as it stood, everything." Later he said that he was attempting to sell both the physical assets and the capital stock of The Portland Telegram.

According to his account of the negotiations, Redhead made five or six trips to Seattle to see Canfield, and Benjamin came to Portland five or six times in connection with the purchase of the Telegram. Redhead testified that he did not, he thought, go "over the

lease with any one else,'' except Benjamin, although he may have ''discussed it informally with Mr. Powers,'' as he had seen the lease in the office of Powers ''before the paper was sold.''

Some little time after the sale of the Telegram to the defendant was consummated, Redhead procured from the Bardes through Nelson, their attorney, an option for the purchase of the Telegram building for $275,000, with the expectation of selling it to the defendant corporation. He was to receive a commission of approximately $9,000, if successful in making the sale.

What has above been said concerning Redhead's dealings with Canfield and Benjamin has been taken from his own testimony, as Canfield had died some years before the trial and Benjamin was not called as a witness.

Brockhagen testified that about March 12, 1931, Benjamin telephoned and made an appointment with him with reference to the purchase of the Telegram. As far as Brockhagen remembered, when Benjamin came to see him no discussion was had between him and Benjamin concerning any negotiations between the latter and Redhead; and it was Brockhagen's opinion, according to his statement, that they were negotiating a sale of the capital stock of The Portland Telegram. Brockhagen testified, however, that Benjamin told him that Redhead had made trips to Seattle to consult Benjamin's principal and had told him that the property could be bought for $750,000, but that Benjamin, when he first saw Brockhagen, ''wanted to know about the terms, and how much down would be paid, and so on and so forth, and he wanted to investigate that lease a little further there.''

In that connection, Brockhagen testified that he made the following statement to Benjamin: ''Of course,

Mr. Benjamin, you can't buy this newspaper without buying that lease, because Mr. Fleishhacker and myself under no consideration will sell this paper unless some one takes the lease. * * * You could readily appreciate our selling a paper and having to move out of there and consolidating it with the News, and leaving us with a whole building here on our hands for 15 years at $1,816 a month. We would just simply be crazy if we considered that.'' Benjamin, according to Brockhagen, made a counter-proposition that Brockhagen and Fleishhacker take the News building at a valuation of $150,000, and Brockhagen replied that he would submit the matter to Fleishhacker.

Arrangements were made by Benjamin and Brockhagen to meet Fleishhacker in San Francisco, and the meeting was held April 6, 1931. At that conference Fleishhacker, according to Brockhagen, advised Benjamin that, ''There is no use talking to me about buying that paper unless you buy that lease.'' Some discussion also was had as to Fleishhacker and Brockhagen's taking over the News building in Portland. At that meeting there was also discussed the price to be paid for the Telegram, and, Brockhagen testified, Fleishhacker said he wasn't going to be bothered much about it, or the price was going to be $850,000, that was what he told him [Benjamin].''

Prior to May 2, 1931, Benjamin called on Brockhagen five or six times in Portland and on April 21 told Brockhagen that his associates were ready to close the deal for $750,000, if the payments could be arranged. Brockhagen advised Benjamin that Fleishhacker would be in Portland on the first or second of May, and Benjamin replied that he would try to meet Fleishhacker and Brockhagen at that time, accompanied by

one of his principals. After first stating that he did not remember whether Powers had accompanied Benjamin at any of the conferences with him, Brockhagen remembered that Powers was present on April 22 with Benjamin and that on that date he turned over to Powers, in the presence of Benjamin, "the lease on the building," which Powers still had.

An original and a supplemental contract were entered into by the plaintiffs and the defendant relative to the sale and disposition of the capital stock and assets of The Portland Telegram. The original contract was entered into on May 4, 1931, and it is well to refer to its terms before setting forth the evidence relating to the conference between the plaintiffs and the representatives of the defendant corporation, held in Portland on May 2 and 4, 1931. The whereas clauses of this instrument state that the defendant corporation has agreed to purchase all the capital stock of The Portland Telegram for the sum of $750,000; that Fleishhacker and Brockhagen are the owners of that stock and that the plaintiffs and the defendant have agreed "that the following shall be the terms and conditions of said purchase and sale." It is then set forth that the defendant corporation will immediately form or cause to be formed a corporation under the laws of the state of Oregon, to be known as The News-Telegram Publishing Company or by some similar name, and that the corporation to be so formed shall take over all the physical properties and other assets of The Portland Telegram and of the defendant corporation and cause to be issued bonds in the sum of $500,000 secured by all the assets of every nature and description of the two corporations. It then provides the interest to be paid on the bonds, the denominations of the bonds and the

date when payable, and states that the bonds shall be issued to the Anglo & Paris-London National Bank of San Francisco as trustee.

The agreement further provides that the sum of $50,000 shall be paid in cash "and the purchaser to assume the difference between current assets and current liabilities of said The Portland Telegram, Inc., which in no event shall exceed the sum of $200,000 in favor of current liabilities. In the event said difference exceed the sum of $200,000 such excess shall be paid by Herbert Fleishhacker and C. H. Brockhagen and, in the event said difference shall be less than the sum of $200,000 such deficit shall be paid by the purchasers to said Herbert Fleishhacker and C. H. Brockhagen, but in no event shall the total purchase price exceed the sum of $750,000."

The original contract also contains other provisions, one of which is that the assets and liabilities of The Portland Telegram for the purposes of the agreement shall be as of May 1, 1931. There is also a provision that the purchaser assumes no liability for personal services rendered by Harry Marcus and that neither of the plaintiffs will within five years after the execution of the agreement establish and publish any newspaper in the city of Portland. The agreement ends with an acknowledgment of the receipt of $50,000 as first payment, and is signed by both plaintiffs, with this notation in the handwriting of Ely following their signatures: "O. K. by Harry W. Ely, Pres. Portland News Pub. Co."

The account given by E. W. Scripps of the conference held in Fleishhacker's room in the Portland hotel on May 2 and 4, preceding the signing of the agreement is as follows: There had been some discussion

on long-distance telephone between Scripps and Canfield, who had headquarters in Oakland, California, and Seattle, Washington, respectively, regarding the purchase of the Telegram for approximately $750,000, and it was suggested by Canfield to Scripps that the latter attend the conference with Fleishhacker and Brockhagen in Portland early in May. Scripps was somewhat familiar with the business competition among newspapers in Portland, where there then were one morning and three evening daily newspapers. He had previously discussed that matter with Judge Curts, although not in connection with purchasing The Portland Telegram. Scripps was not in any way familiar with the negotiations initiated at any of the alleged conferences between Redhead and Canfield or Benjamin and between Benjamin and Brockhagen or Fleishhacker.

The second of May was on Saturday and most of that day was spent in conference between Scripps and the plaintiffs. In that conference Scripps, according to his testimony, represented the defendant corporation and the majority of the stockholders of that company and of the Scripps Newspaper Company. Assisting Scripps and present during part or most of the conference on Saturday and the following Monday were Benjamin and Dan Powers, the latter of whom had performed legal services for the defendant corporation.

During the conference the discussion touched upon "any libel suits that there might be against" the Telegram and "any other hidden debts or obligations, things that might not appear on the surface." The interested parties finally came to the agreement that any liability beyond a total of $200,000 should be assumed by the plaintiffs.

In referring to the matter of advertising, Scripps testified as follows:

"Of course, as far as I was concerned, the advertising was the main consideration,—we felt, in discussions I had with Mr. Fleishhacker, I told him that I didn't think the plant and equipment or any other consideration would be worth more than what he paid for the property to begin with, but with this large amount of advertising which he controlled, it would be easily worth a great deal in excess of that price. He told me that we would continue to get the advertising which was running in the Telegram, he assured me that he would, and I believed it, I thought he was telling me the right information, that is, that we would continue to get this business, and of course, over a period of time, that it would offset this large purchase price, in other words, he assured me that I could pay these bonds off with the profits that I would get from this additional advertising."

On this same subject, Scripps further testified:

"Mr. Fleishhacker said he had enough influence to cause that to be continued, so that,—and he went even further than that in his statement to me and said that we would not only run as much advertising as the old Telegram ran, but that we would get more, in other words, with the combined properties that we should get a larger amount of advertising. * * * There was a statement from Mr. Fleishhacker to me at the time of this deal that he controlled enough advertising, had enough control to continue the same advertising that we were getting, that he was getting, rather, in The Portland Telegram,—that we would not be in any different position than they were."

He was asked by counsel, "What, if anything, was said, as to how you were to be assured of getting that advertising, what reason you had to believe that you would get that advertising?" His answer was: "The reason I felt that we would get it was because Mr.

Fleishhacker had, I believe that he had a great deal of influence with these businesses, and I saw this advertising in the paper that he owned, the Telegram, and I believed with his assurance that I would continue to get that business, his word was good on that point, and we would get it."

On cross-examination Mr. Scripps was interrogated as follows: "So that when Mr. Fleishhacker and Mr. Brockhagen told you that they would help you get this advertising, did you believe that no matter what happened that they could deliver that advertising?" To this he replied:

"Well, I believed that Mr. Fleishhacker and Mr. Brockhagen had the prestige and standing in this community, that had attracted this high-class advertising to them, and that their statement to these stores would continue us on that basis, I thought their assurance of that would mean that we would continue to get their advertising all right. I had before this deal, I have always had, a high regard for the integrity of Mr. Fleishhacker and Mr. Brockhagen."

To another question on cross-examination as to whether or not he had been introduced to the heads of two department stores in Portland by Mr. Fleishhacker, Scripps answered in the affirmative and stated that they had not talked about contracts or commitments, and "I relied on Mr. Fleishhacker's word . . . that this business would continue with us, and the business that he had been getting was on such a basis that everybody felt that they were getting value for value received."

Scripps testified that after the Telegram had been taken over by the News the advertising that had theretofore been carried by the Telegram was continued for about two months in the consolidated paper and that

it then sharply decreased. He testified to a conference with Brockhagen and Fleishhacker as follows:

"I asked them why it was that we were not continuing to get this advertising, and Mr. Fleishhacker says, 'Don't let that worry you,' he says, 'I will fix it up so that it will be all right.' And there were a number of small accounts handled by our national representative there, and he had assured me that he would see to it that we continued to get that business, and every time I saw him he assured me that everything was going to be all right about it, but we didn't get the business, and I saw him about two or three times and then stopped asking him about that."

Scripps further testified that the advertising in their newspapers (apparently referring to the Scripps-Canfield chain) "represents approximately around 70 per cent of our total revenue,—the other 30 per cent is from the sale of the paper, subscriptions,—70 per cent of our revenue is from our advertising." He also stated that, "The larger the newspaper is the larger the percentage of advertising, in other words, a large newspaper that is running a large volume of advertising like the Journal here, who are very successful operators, I would say with them it would be about 80 per cent."

Brockhagen testified that he had discussed with Scripps two department stores' advertising. Asked what was said about it, he answered:

"Well, they said they were desirous of getting the same amount of advertising from Meier & Frank and Olds & King which we enjoyed, which was a great deal more than was being enjoyed by the News, so we told them we would cooperate with them in every way and try to help them get as much advertising . . ."

He further testified that the rate for advertising depended on the "net paid Audit Bureau audit of circulation" of the newspaper. He said that he did cooperate with the defendant to the fullest extent; that

he had taken Benjamin out to see the manager of one of the large department stores; and that Fleishhacker had invited the manager of another department store up to his room for lunch with Benjamin, Scripps, Brockhagen and Fleishhacker, and had told this manager in confidence, "The probabilities are that these gentlemen are going to buy the Telegram," and asked him to give the consolidated newspaper as much space as he had been giving the Telegram. The manager said that he would do so if the advertising would be carried on pages 3 and 5 of the News-Telegram. Brockhagen also stated that some time after the transaction had been consummated, Scripps came into his office and advised him that the Olds & King store was not using a full page and that he had done all he could in San Francisco with the father of the manager of that store, to procure more advertising.

Fleishhacker testified about the advertising as follows:

"Q. Did you make any representations to any of those gentlemen that you would assure them or guarantee them that they would get as much advertising from the department stores, they would enjoy as much advertising from the department stores as the Telegram had in the past? A. That is such a silly question. Mr. Benjamin was an old, experienced newspaper man, and he knew that I couldn't in any way handle the business of Meier & Frank or any other concern up here. I did tell the gentlemen several times that I would be happy to give them my full cooperation, and that is about all I did with Mr. Brockhagen when he was running it, I came up here very seldom, and I tried to use my influence if I had any to help get business, and that is all I could do.

"Q. Did you in fact do anything to help them with their department store accounts? A. I was on friendly terms with a lot of people up here, and it is possible

that on account of that acquaintanceship and friendship I was able to help the paper in getting some business.

"Q. Did you ever speak to Mr. Schlesinger about advertising? A. Oh, yes. Q. Giving them advertising? A. Yes, I spoke to Mr. Schlesinger, and Mr. Julius Meier, telling them I would appreciate it if they would give as much business as possible to Mr. Brockhagen. That is natural,—I owned almost 80 per cent of the paper, and I wanted to see it a success. Q. Did you speak to them about giving advertising to the News after the Telegram had been sold to them? A. I told them that I would appreciate it if they would give as much business as they possibly could, and they said that if they found they got results, they would continue, that is about all."

Fleishhacker testified that he was, and for many years had been, socially very close to Julius Meier and that after signing the first contract on May 4, 1931, he stopped on his way south to see Governor Meier. He was also very friendly with Mr. Schlesinger and owned a few shares of stock in the Schlesinger company, which was interested in the Olds & King store. In addition, he also was interested, he said, in many department stores up and down the coast and in steamship companies which did a large amount of advertising. He further testified:

"Q. So if the Telegram had been enjoying any more advertising from the department stores than might ordinarily be expected, based on its circulation, that was not because of any influence of yours? A. I wouldn't say that, I don't know. I hope I had some little influence with them, I was friendly with them, but I was not on the payroll of the paper, I wasn't soliciting advertising, I have never drawn a cent out of this paper as an employe, and as I told you before, I paid positively no attention to the running of that paper.

"Q. And there was no statement made by you to Mr. Scripps that you had any means, or influence, or

connection that would help you in getting advertising for the Telegram? A. Mr. Scripps must have known, as his associates must have known, that I was friendly with two or three of the large stores here, they must have known that. Q. But you didn't tell him that? A. I don't know what I told them, I don't remember the details, I didn't tell them that I was going around to this, that, or the other store, to try to drum up business for them."

Attention has already been directed to the testimony of Roscoe C. Nelson to the effect that he had procured advertising for the Telegram at the time it was taken over by Fleishhacker and Brockhagen. In this connection he said:

"And finally Robert Smith came to me, and he got me to go to Meier & Frank and Olds & King, to get Meier & Frank to agree to take an extra page in the paper, and other inducements to get Mr. Fleishhacker to run the paper, and I did that, I went out and solicited advertising.

\* \* \* \* \*

"Q. Do you recall that in fact the advertising was increased, the local department store advertising was increased about double in September [1927] over what it had been before? A. I know very well it was increased, because as I have told you, I was instrumental in getting some of the advertisers to go in, and the reason they did it was because they were scared of Hearst."

At the time of the purchase of the Telegram the News had a circulation of over 60,000. After the consolidation, upon the expiration of paid-in-advance subscriptions to the Telegram, the circulation of the News-Telegram (the name under which the consolidated papers were published) was about 69,500, an increase of between 7,000 and 8,000 over the original News circulation, although the Telegram was supposed to have a circulation of approximately 52,000 at the time it was

purchased by the News. Mr. Ely, who was president and manager of the defendant, corporation, testified that: "The Telegram had been one of a few newspapers in America to use an old-fashioned contest arrangement of giving automobiles, pianos, houses and lots and what have you, for paid-up in advance subscriptions. We found out in taking over the Telegram and getting into their records, we found that there were Chinamen and Filipinos and such as that on the subscription list who had paid-up subscriptions, who told us that they could not read English." He further testified that "the good will value that a newspaper has, a newspaper that is continually running contests and artificial means of continuing their circulation, the cost is very prohibitive to hold their circulation."

It was the opinion of Mr. Scripps that the circulation of the News had been under 60,000 and that there was an increase of between 10,000 and 12,000 subscribers obtained through the consolidation of the News and the Telegram. He also stated that when circulation of newspapers is increased by means of contests, "it generally makes people sore" and they do not continue their subscriptions beyond the paid-up period.

Another instance of misrepresentation by the plaintiffs, as alleged by the defendant, is that they made false representation that The Portland Telegram was operating at a profit, whereas in fact it was operating at a loss of more than $70,000 a year. In this connection Scripps testified that he was furnished by Fleishhacker a balance sheet of The Portland Telegram as of April 30, 1931, a copy of which was attached to the bill of sale, and that this balance sheet was given him for the purpose of showing the value of the property. The copy of the balance sheet attached to the bill of sale sets forth,

as of April 30, 1931, the current, fixed and other assets, including circulation and good will valued at $500,000, in separate columns, and likewise the current and other liabilities separately listed, also the capital stock outstanding. Nothing is shown as to the earnings of the corporation.

As to representations made by the plaintiffs concerning profits of The Portland Telegram, Scripps testified as follows:

"Q. During the course of your negotiations what, if anything, was said with respect to the value of the property listed in that bill of sale? A. During the course of negotiations I was discussing this item here of good will, which is down for $500,000, and it was represented to me, Mr. Fleishhacker said that the paper was making over $50,000 per year profit.

"Q. What relation do profits have to good will? A. Profits determine the value of good will in the business.

\*　　　\*　　　\*　　　\*　　　\*

"Q. Was any information given to you as to the losses that had been sustained during these various months, without enumerating them all, the previous year? A. I was told that they were operating at a profit and not at a loss."

On cross-examination Scripps further testified:

"Q. You don't claim any fraud or misrepresentation, do you, about their assets when they carried their circulation and good will according to the statement they showed you at less than half of what the News carried its circulation and good will? A. I considered the fraud, the fact that they represented that they were making a profit, and that was what was in my mind as the value of good will; if they had a big property and a lot of assets and losing money, it isn't worth anything.

"Q. Well, you thought they were making a profit? A. I thought so, I thought they were making about $50,000 a year."

The uncontradicted evidence shows that The Portland Telegram had lost money during every year of its operation and that for the year ending April 30, 1931, it had suffered a loss in excess of $70,000. Brockhagen expected, he testified, that it would take from five to 10 years to get the Telegram on a profitable basis. Fleishhacker testified that the paper was losing money and would not have been sold if it had been making a profit. Both of the plaintiffs further testified that during the negotiations for the sale of the Telegram the question of whether or not that paper was making a profit was not mentioned; and Redhead testified that in his negotiations with Benjamin and Canfield that subject was not discussed.

In this connection mention should again be made of the fact that in December, 1930, the machinery of The Portland Telegram was written up in excess of $45,000, circulation and good will at $500,000 and Associated Press membership at $50,000; and that in April, 1931, the Associated Press membership was written up another $50,000. There is further evidence to the effect that the machinery and equipment during the time that they were owned by The Portland Telegram were depreciated each year until 1930, during which year no allowance for depreciation was shown on the books.

The third false representation alleged by the defendant to have been made by the plaintiffs, which induced the defendant to purchase the stock and assets of The Portland Telegram, was that the lease of the property at Eleventh and Washington streets, between the Bardes and The Telegram Publishing Company, had been "wiped out in the bankruptcy proceedings" and that The Portland Telegram was then occupying the building as a month to month tenant, although in fact the old lease had been revived and its obligations had

been assumed by The Portland Telegram through a new agreement made subsequent to the bankruptcy proceedings.

During the negotiations between Scripps, representing the defendant corporation, and the plaintiffs, in Portland on May 2 and 4, 1931, considerable discussion was had, according to Scripps, concerning the occupancy of the building by The Portland Telegram. The following is part of his testimony on this subject:

"Q. Now what, if anything, was said with respect to the occupancy of this building up there, that is, the method or means whereby The Portland Telegram were occupying this building at Eleventh and Washington streets? A. Well, during the discussion, I noticed that they were paying an exorbitant amount of rent, and I questioned him [Fleishhacker] about that, asked him if there was any lease or any commitment that The Portland Telegram had, and he said, 'No,' there wasn't, 'that if there had been any that it was wiped out when the property went through bankruptcy.' And during our talk I said that I would continue to pay the rent on the property as long as we occupied the building, but that I felt that on this item alone of $1,800 a month, that we could make a substantial saving by moving into our present building, moving all our operations into that, thereby saving that amount, which he agreed would materially reduce the expenses."

Scripps also testified concerning the saving that could be effected by consolidating the two papers, stating that the plant of the News was very efficient, with good machinery and presses, but that the equipment of the Telegram was antiquated and of very little value. He further testified that it was understood by all parties during the negotiations that the defendant expected to consolidate the two papers and publish them at the News plant. He also gave the following testimony:

"I asked them why they were paying this large and excessive amount of rent, and both Mr. Brockhagen and

Mr. Fleishhacker said that they were paying it because they didn't have any other place to move to, and if they didn't pay it they would get kicked out, . . . they were not obligated to pay it, but it would cost them thirty or forty thousand dollars to move the machinery, very heavy presses and all that sort of thing, rather than do that they would continue in their present location.''

The foregoing testimony of Scripps was given with reference to the negotiations prior to signing the first agreement in the evening of May 4, 1931. He testified that at no time during any of the negotiations was he shown the original or a copy of the lease of December 3, 1921, or the original or a copy of the supplemental lease of August, 1927.

Reference has already been made to what occurred prior to the meeting of Scripps and the plaintiffs in Portland on May 2. The testimony of Scripps last quoted referred to that meeting, as will the testimony now to be reviewed. According to both Fleishhacker and Brockhagen the question of the lease had been settled between the plaintiffs and the defendant prior to this meeting. Although Brockhagen testified that at the meeting of May 2 they discussed all the ''innumerable details'', agreed upon price and terms and reached a tentative agreement, yet he stated: ''Well, I don't know as the lease was discussed in those meetings in Mr. Fleishhacker's room, it might have been brought up incidentally.'' On cross-examination he was asked: ''But you never discussed the lease yourself with Mr. Scripps, did you?'' His answer was: ''No, I did not.'' Brockhagen further testified on cross-examination as follows:

''Q. To what extent was the lease discussed during that discussion? A. Well, I don't remember of any discussion much about the lease in those conferences,

because that had all been arranged, the detail was practically settled before Mr. Fleishhacker got here.

"Q. Whatever the reason might be, there wasn't much discussion about the lease? A. No, it was taken for granted that they had assumed the lease."

Fleishhacker stated that on Monday afternoon, May 4, some one wanted to know about the Barde lease and he said that he "wasn't entirely conversant, but that Mr. Veatch had been the attorney for the Telegram before I ever took it over, and he, undoubtedly he knew the details, or the provisions, and we all went over to Mr. Veatch's office, at which time we discussed the lease, and all other matters that had been discussed prior to that particular meeting." He stated that he thought the parties were in Veatch's office two or three hours. All through his testimony, Fleishhacker maintained that the assumption of this lease by the defendant had been agreed to and that there was no further necessity for mentioning it. In referring to whether or not the question of the lease was discussed in the Portland hotel, he stated: "I can't recall that, it is possible that it came up, because Mr. Benjamin went into so many suggestions, I didn't have a chance to get a word in hardly between Dan Powers and Mr. Benjamin, and me or Mr. Brockhagen, I don't think Mr. Scripps or I had a chance to say very much." He further stated that he thought Brockhagen was mistaken when he said that the matter of the lease was not mentioned in Veatch's office.

Fleishhacker's attention was called to a deposition which he made in December, 1932, in California, in which he testified among other things as follows:

"Mr. Scripps told me that he was very anxious to purchase the paper and consolidate it with his. We had a great deal of discussion over the price and conditions of sale and purchase. He at one time only wanted to purchase the physical assets, plus the Associated Press

franchise. I told him that I wouldn't sell the paper unless he took over the paper in its entirety, every obligation of the paper; and there was a good deal of discussion about the lease, or the tenancy of the building owned by Barde; and I told him very emphatically that there could be no sale, or there would be no sale, unless he assumed every obligation. The question of the acquisition of this paper was discussed at length; and they absolutely agreed to take every obligation, including the so-called Barde lease. * * * We talked over at length this lease, and Mr. Scripps and Mr. Powers, the attorney, did most of the negotiating for their trio. * * * That was gone into not once, but a dozen times, because the consummation of the deal finally depended upon their taking over that obligation.''

When asked whether or not that was substantially the way he had testified in the deposition, Fleishhacker stated: ''Yes, I recall that is substantially the way I testified, I have read it over several times since, but I have told you my memory is tricky, and when I refer to Mr. Scripps, I refer to this trio [Scripps, Benjamin and Powers], I didn't mention Mr. Benjamin in there, and as a matter of fact Mr. Benjamin did most of the talking. * * * I told Mr. Dunne [apparently Fleishhacker's attorney] I was very hazy, but I would testify to the best of my recollection, which was not good at that moment, I had not had a chance to refresh my memory. Since then I have heard so much about the thing, and a lot of things have come back to my mind that escaped me at that time.''

Fleishhacker further testified that he did not know anything about the 1921 lease or the conditions of the second lease, and ''I haven't the remotest idea, as I told you, I have never read either of these leases.'' He was interrogated as follows:

''Q. Did you know that The Portland Telegram had in fact assumed all the obligations of the lessee

under the lease of December third, 1921, except that the rental had been reduced, and there was a provision in respect to the right to alter the property,—you didn't know that? A. As I told you I did not know the conditions of either of those leases, and I did not know the verbiage, know what the second lease actually carried, whether it took the obligations of the first or not; I did not know that, Mr. Shields.

"Q. You did not know whether it did or not? A. No. Q. Did you have any impression on that subject? A. I did not give it any thought. I don't know whether the bankruptcy wiped it out or not. I have no thought on that subject of the 1921 lease. I do know that the Telegram was responsible for the 1927, lease, but what is the difference between those two leases, I don't know today, and I never did know, I can't answer that question.

"Q. You say you did not know that The Portland Telegram was bound by the 1927 lease? A. Yes, the Telegram was bound by the 1927 lease, that is my judgment.

"Q. Did you know that at the time The Portland Telegram became bound on the 1927 lease? A. No, sir, I told you I didn't read those leases. They have only been discussed since these suits have come up."

According to the testimony of John C. Veatch, who was attorney for the plaintiffs at the time, the parties who had been attending the conference in Fleishhacker's room in the Portland hotel came to Veatch's office one day about 4:30 or 5 o'clock, announced that the Telegram had been sold to the News and wanted "to have an agreement drawn up covering the sale." They were in his office perhaps half an hour or an hour and they all then went to Fleishhacker's room. Veatch stated that there was considerable conversation about the transaction and he endeavored to find out what the terms were to be, "and they discussed various angles of it,—said that the News was to take over the Tele-

gram, lock, stock and barrel, and everything they had, . . . the lease was to be turned over.'' The condition of the accounts was discussed and no one ''seemed to know what the current assets and current liabilities were,'' wherefore Veatch suggested that it would be better to wait and find out what they were ''before they tried to draw up an agreement''. He did not remember ''whether it was Mr. Powers or Mr. Benjamin'' who ''brought up the question of the lease, and I think Mr. Brockhagen said he had never seen the lease, and all he knew about it was that they had to pay so much rent every month. And they asked me about the lease, and I explained to them what the conditions of the lease was at that time, and Mr. Benjamin and I discussed that for a little bit.''

Veatch then stated that he asked Benjamin what they expected to do with the building and Benjamin replied that they had not decided whether to move the plant of the News to the Telegram building or keep it where it then was. It was his opinion that the parties were together in the Portland hotel about an hour or an hour and a half before the contract was signed. At the time they came to his office, Veatch stated, they had a memorandum which had been prepared, and he did not believe that he had prepared any agreement for them. He did, however, after reaching the hotel, write in long hand the amendment which was attached to the memorandum agreement, concerning current assets and liabilities. He further testified:

''Q. Was there any objection raised that you know of to their taking over the lease? A. No, the only discussion about the lease that I remember was that they didn't seem to know exactly what the terms and conditions of the lease was, and Mr. Brockhagen said that he didn't know anything about it, except that he paid so much rent every month. The lease wasn't there at the

time they had this meeting, there wasn't any copy of it there.''

A little farther on in his testimony Veatch said:

''Mr. Brockhagen said he didn't know anything about it [the lease] or he had never seen it, or something, that all he knew he had to pay so much rent,— and that is when they asked me about the lease, at the time, the conditions of it.''

The only recollection that Veatch had of the supplemental agreement of August, 1927, whereby The Portland Telegram assumed the former Barde lease, was what he remembered of that document at the time it was made. At that time he was consulted by J. E. Wheeler, one of the guarantors of the original lease, and, acting as attorney for Mr. Wheeler, Veatch had examined the 1927 agreement whereby The Portland Telegram assumed the liabilities of the former lessee. He had not, however, seen it or the original lease between that time and the day of the conference in his office.

In testifying as to whether or not he believed that the bankruptcy proceedings wiped out the obligations of the Barde lease, Veatch stated: ''It is my opinion as a lawyer, Mr. Shields, that neither the trustee in bankruptcy, nor any one else, could sell the assets of a corporation, whether in bankruptcy or not, and free it from its liabilities, and this lease was a liability of The Telegram Publishing Company at the time of the bankruptcy.''

Several months after purchasing the Telegram, the News was made defendant in an action brought by the Bardes to collect past-due rents on the old Telegram building. There is testimony to the effect that Veatch was employed by the News to represent it in that proceeding and look after its interests as well as

those of Fleishhacker and Brockhagen. When questioned about the proceedings in that action, Veatch at first was of the opinion that he had no connection whatever as attorney in that case, and that the first time he discovered that he was mentioned as an attorney of record therein was when the briefs were filed on appeal of the case to the supreme court, whereupon he immediately had his name withdrawn as attorney of record. The proceedings in the circuit court, however, show that Veatch appeared as attorney and took an active part in the trial of the case.

Hahn, who had become general counsel for the Scripps-Canfield newspaper chain, testified that in the latter part of 1931, while on his way to Portland (from Los Angeles) to defend the action brought by the Bardes against the News, he stopped off at San Francisco and interviewed Brockhagen and Fleishhacker, and Brockhagen then said to him that the Telegram had no lease of the building, and that it was paying rent only from month to month. After reaching Portland, Hahn wrote, telephoned or telegraphed to Brockhagen for a statement confirming what Brockhagen had told him about the lease, and in response received from Brockhagen the following letter under date of January 9, 1932:

"The agreement entered into on May 25, 1931, between Herbert Fleishhacker and C. H. Brockhagen, Portland News Publishing Company and The Portland Telegram was not an assignment or transfer of the lease dated December 3, 1921, between Rose Barde and The Telegram Publishing Company.

"None of the parties to the agreement of May 25, 1931, just referred to were parties to the Barde lease, nor did The Portland Telegram, a corporation, either directly or indirectly, assume any obligations under this lease. Furthermore, there never has been any assignment or transfer, expressed or implied to, or guaranteed

by, Herbert Fleishhacker and C. H. Brockhagen of the lease referred to or any of its provisions.

"The contract of May 25, 1931, was part of the transaction involving the sale of The Portland Telegram and was entered into to protect the seller from litigation arising after the sale, as the purchaser undertook to assume all liabilities arising and to defend such litigation as might be initiated after the transfer of the property, as specified in the contract."

Fleishhacker's attention was called to this letter from Brockhagen to Hahn and he was asked whether or not it expressed his views concerning the Barde lease. He stated that he was not in a position, without consulting a lawyer, to give his views. He admitted that he knew very little about the conduct of the Telegram before it was sold and that he was a salesman and not a newspaper man.

The contract for the sale of the Telegram was signed in Fleishhacker's room in the Portland hotel about 7 o'clock Monday evening, May 4. Ely, the president and manager of the defendant corporation, was requested to come to the room and sign on behalf of the defendant, and was there about 10 or 15 minutes. During that time and at his suggestion, according to his testimony, the amendment as to current assets and liabilities hereinbefore mentioned was made. Not any of the other terms or conditions were discussed by any of the other parties with Ely or in his presence. He stated that he had no part in the negotiations for the purchase of the Telegram and that in signing the agreement he was a "dummy" in carrying out Scripp's instructions.

The late evening edition of the May 5th Oregonian carried the story of the sale of the Telegram to the News, in which it was stated that previous negotiations for the sale of the Telegram to the News "had come to naught" and that the chief obstacle had been the

desire of the Telegram owners to dispose of the lease along with the newspaper property and that the News had declined to take it over because of having its own building. The article stated that in the final negotiations the disposal of that matter was not made known.

The News took over the Telegram immediately upon the signing of the contract of May 4, and published one or two regular editions of the Telegram before consolidating it with the News under the name of The News-Telegram. A four-page edition of the Telegram, however, was published until about May 13, in order to hold the Associated Press franchise, which on or about that date, with the consent of the plaintiffs, was sold to the Journal for $75,000. The Journal paid $15,000 in cash and for the balance gave four notes of $15,000 each, maturing in four successive years. The News paid the cash to the plaintiffs and turned over the notes to the trustee to apply on the contemplated bond issue, which was reduced from the agreed amount of $500,000 to $485,000.

After the defendant took possession of the Telegram plant, the plaintiffs and the defendant each had auditors representing them go through the books and ascertain the current liabilities and current assets. Fleishhacker had gone back to San Francisco and did not return to Portland for further negotiations, but Brockhagen remained in Portland until after the agreement of May 25 was signed. On or about May 14 the auditors came to an agreement as to the amounts of current assets and liabilities.

Platt Kent, an attorney and trust officer of the Anglo & London Paris National Bank of San Francisco, was sent by Fleishhacker to Portland to represent the plaintiffs and the bank as trustee, in preparing the necessary documents for the bond issue. He arrived

in Portland May 9. According to his statement, Kent went over the details of the supplemental agreement with Powers, then attorney for the defendant, and when asked whether or not the lease was ever discussed, he answered: "I don't think it was, it was taken for granted that the lease was to be assumed, and I stated that that was the case, that the Barde lease was to be assumed by the News." He said that he had not, so far as he recalled, had any discussion with Scripps concerning the lease prior to May 14, and that at a meeting of the interested parties on that date he brought up the subject and stated that the lease from the Bardes to the Telegram was to be assumed by the News, and both Scripps and his auditor acquiesced.

In connection with the foregoing testimony reference might well be made here to correspondence had between Kent and Hahn in November, 1931. On the fourteenth of that month Hahn wrote Kent, referring to a letter from the Bardes which Kent had mailed to Scripps, concerning a fire insurance policy on the Telegram building. Hahn advised Kent that Scripps and his associates did not feel that their organization or any member of it was legally liable for the insurance on that building. He also stated that while in San Francisco he had informed Kent that the Barde estate claimed that The Portland Telegram had purchased the lease on the building. He further stated in the letter that in a discussion with Veatch the latter had assured him that Fleishhacker and Brockhagen had no lease with the Bardes, and therefore the Telegram had no lease to sell to the News. In that letter he further advised Kent as follows:

"And a conference with Mr. Brockhagen verifies that neither he nor Mr. Fleishhacker had a lease on the Telegram building, but were tenants from month to month."

In answer to this letter, under date of November 17 Kent wrote, after acknowledging Hahn's letter:

"I had no special reason in forwarding the letter received from the Barde people to Mr. Scripps except that I thought it would be advisable for you all to know of the various communications that have been sent to Mr. Fleishhacker and Mr. Brockhagen, so that you might have the information therein contained for what it is worth. If you think it advisable you might let me know who is handling the litigation in Portland [apparently referring to the action brought by the Bardes against the News for past-due rents] so that I can forward any additional communications.

"Such knowledge as I have of the situation confirms the statement in your letter that Mr. Fleishhacker and Mr. Brockhagen had no lease with the Bardes, nor did they in any way guarantee the performance of any."

After Kent reached Portland there were numerous conferences among the interested parties concerning the final draft of the contract, and according to Kent these conferences had reference especially to the question of how the "accounts payable and accounts receivable" were to be handled. The plaintiffs did not want to leave the collection of the accounts receivable to the defendant, because they felt that the defendant would not make any great effort to collect them. Kent suggested that "the thing to do is to arrive at some understanding, some arbitrary discount on those accounts receivable", and finally, according to Kent's testimony, his suggestion was followed.

The original memorandum agreement contemplated that a new corporation would be formed and that the assets of the News and the Telegram would be transferred to it to be used as security for the bond issue. This plan was abandoned, Kent testified, on or about May 14, and it was agreed that the assets of the Telegram should be transferred to the News and held with

its assets as security for the bond issue, which was to be a first lien on all the combined assets.

After the meeting of May 14, Kent went to San Francisco, where Joseph Haber, attorney for Fleishhacker, prepared the contract of May 25, which was brought to Portland by Kent about May 22 and thereafter signed without change.

Prior to its execution the supplemental agreement was gone over by Powers on behalf of the defendant and approved by him. It was signed on May 25 at the trust department of a Portland bank. At the same time there were executed the deed of trust securing the bond issue, the bill of sale of personal property from the Telegram to the News, and other documents. No formal or separate assignment of the lease from The Portland Telegram to the defendant was ever made.

According to Nelson's testimony, Powers and Scripps called upon him on May 25, 1931. In referring to this meeting, Nelson said: "And then I had an interview with Mr. Scripps and Mr. Powers, which for years I had been under the impression occurred later in the summer, but which from a check of our files I am inclined to believe occurred on May 25, 1931." He then referred to some "transfer slips" which were taken from the original slips made by the telephone operator in his office, showing calls made on different members of the firm. One of these was dated May 25, 1931, and under the heading "Nature of Service" is: "Conference with Mr. Powers et al., 23 minutes." Another slip, also dated May 25, 1931, has this notation: "Preparing six copies of *agreement to reduce rental* on Telegram building, executed *August 31, 1927,* between Rose Barde et al. and *The Telegram Publishing Company,* and delivery same to Mr. Powers." (Italics supplied.) It might be noted that the *"assumption of lease agree-*

*ment"* was between *The Portland Telegram* and the Bardes, and their signatures thereto immediately follow the date of the agreement, August 31, 1927.

Nelson stated that during this interview he mentioned the lease and Scripps stated that he had no knowledge of the existence of any lease. Then, according to Nelson's testimony, he gave to Scripps and Powers a history of the entire transaction, beginning with the original lease of 1921 and including the new agreement after the bankruptcy of The Telegram Publishing Company. Scripps then said, Nelson testified, that the building was poorly designed and he did not think it adequate for their purpose, whereupon Nelson stated to Scripps, "that it looked to me as though the best thing for him [Scripps] to do would be to buy the building even though he had to sell it at a loss of $50,000, if he was not willing to occupy it."

Nelson further testified that he had represented the Bardes in the action brought by them against Fleishhacker and Brockhagen to collect past-due rents, but that he had been a close personal friend of Fleishhacker for some 20 years.

The supplemental lease does not specify the duration of the tenancy, the amount of rental or how it is to be computed, or the numerous other provisions of the original lease. Practically all that could be ascertained by reading the supplemental lease alone would be that The Portland Telegram had assumed all the obligations imposed upon The Telegram Publishing Company prior to its bankruptcy, with the exception that the annual rental had been reduced $4,200 and the new lessee was permitted to make alterations in the building. It might also be mentioned that Nelson, as shown by his testimony, appeared to assume at the time he was talking to Powers and Scripps that the News had already become

obligated to carry out the terms of the supplemental lease.

Scripps testified that he knew that The Telegram Publishing Company originally had a lease on the property occupied by it, but that he had been told by the plaintiffs that the lease had been wiped out in the bankruptcy proceedings, and he did not know until some time after the May 25 contract was signed that the Telegram had assumed the lease or was occupying the building otherwise than as a tenant from month to month. He stated that he had had a talk with Nelson three or four months after the News purchased the Telegram and that Nelson, who was representing the Bardes, wanted the News to buy the building and at that time Nelson advised Scripps that "there was an obligation on the lease, and I was surprised to hear that."

Asked specifically whether he had not, on May 25, 1931, before he signed the contract of that date, had a talk with Nelson about the lease, Scripps answered: "Well, it would surprise me if that was so, because I don't remember talking about any lease or an obligation with Mr. Nelson at that time, it may be that I saw him, I saw an awful lot of people along about that time." His further testimony on this subject was as follows:

"Q. Well, you wouldn't say that you didn't see him that day? A. No, I wouldn't, I wouldn't be able to say who I saw or didn't see, but I would know what I saw them about, I think."

Scripps definitely stated that the matter of the lease had not been discussed in Veatch's office on May 4.

The agreement of May 25, 1931, herein mentioned, reads as follows:

"This agreement made and entered into this 25th day of May, 1931, by and between Herbert Fleishhacker

and C. H. Brockhagen, first parties, The Portland News Publishing Company, an Oregon corporation, second party, and The Portland Telegram, also an Oregon corporation, third party,

"Witnesseth:

"Whereas, the second party heretofore purchased from the third party all of its assets and heretofore purchased from first parties all of the capital stock of third party; and

"Whereas, second party has issued to first parties in part payment for such purchase four hundred and eighty-five thousand ($485,000.00) dollars of its first mortgage and collateral trust 6% serial gold bonds dated May 1, 1931; and

"Whereas, to and including May 4, 1931, third party did publish in Portland, Oregon, a newspaper known as 'The Portland Telegram,' and on May 5, 1931, second party did merge said newspaper with the newspaper of second party theretofore published under the name of 'Portland News,' and did thereafter continue the publication thereof; and

"Whereas, the parties hereto desire to supplement the original agreements of sale in the particulars herein set forth;

"Now, therefore, in consideration of the premises and of a good and valuable consideration paid to each of the parties hereto by each other party hereto, the receipt whereof is hereby acknowledged, the parties hereto covenant and agree as follows:

"1. First parties covenant and agree:

"Upon the payment by second party as provided in the trust indenture securing the same of the first year's interest on said four hundred and eighty-five thousand ($485,000.00) dollars face amount of bonds of second party, first parties shall and hereby agree to reimburse second party on account of interest so paid in the sum of five thousand one hundred nineteen and 44/100 ($5119.44) dollars.

"2. To hold second party harmless from any and all liability, past, present or future, arising or which may

arise out of the following actions at law now pending in the courts of the state of Oregon, to-wit:

"Mannix vs. The Portland Telegram
"Knott vs. The Portland Telegram

and the following suits in equity pending in the federal court, to-wit:

"New England Fibre Blanket Company vs. The Portland Telegram.

"3. To hold the second party harmless against any and all actions or suits for libel brought against the third party arising out of any matter published by said The Portland Telegram prior to May 5, 1931. To defend, at their own expense, any and all such suits, and to pay, satisfy and wholly discharge any and all final judgments against third party that may be entered by reason of such suits or actions.

"4. To hold second party harmless from any and all claims of whatsoever kind or nature arising out of any lawful contract, debt or other liability which may in the future be presented against The Portland Telegram and which was not shown on the books of said corporation at the close of its business on the 4th day of May, 1931.

"Second party does hereby covenant and agree as follows:

"1. To assume all liabilities of The Portland Telegram shown on its books of account as of the close of business on May 4, 1931, including taxes, and all liabilities whatsoever of third party and/or first parties under that certain indenture of lease dated December 3, 1921, by and between Rose Barde et al. as lessors, and The Telegram Publishing Company, a corporation, as lessee, and under all assignments thereof and agreements supplementary thereto, which said lease is of that certain building used and occupied by The Portland Telegram and known and described as No. 421 Washington street, Portland, Oregon.

"2. To hold the third party and the first parties harmless and to defend any and all actions or suits for libel arising out of any matter published by second

party in its said newspaper on and after May 5, 1931. To defendant, at its own cost and expense, any and all such suits, and to pay, satisfy and wholly discharge any and all final judgments against third party and first parties that may be entered by reason of such suits or actions.

"The first parties and the third party agree to transfer and set over to the second party all current accounts whatsoever kind and nature outstanding on the books of The Portland Telegram as of May 4, 1931, and specifically agree that they will not, nor will either of them, attempt in any way to collect any of said accounts except at the specific request of, and for the benefit of, second party."

It will be observed that the contract recites that The Portland News Publishing Company had "heretofore purchased" from The Portland Telegram "all of its assets" and had "heretofore purchased" from Fleishhacker and Brockhagen "all of the capital stock" of The Portland Telegram. It also states that the desire of the parties is "to supplement the original agreements of sale in the particulars" therein specified. It will further be observed that the amount of the bond issue was reduced from $500,000 mentioned in the contract of May 4, 1931, to $485,000. This was due to the fact that $15,000 paid by the Journal on the purchase price of the Associated Press membership had been turned over to Fleishhacker and Brockhagen by the defendant.

For several months after purchasing the assets of The Portland Telegram the defendant continued to occupy the Telegram building and collected a small amount of rent from the sub-tenants. It paid to the Bardes the rent for May and June, 1931, and paid something like $14,000 in taxes which were due at the time its contracts with the plaintiffs were executed. It did not remove the heavy equipment from the building until

many months later. Beginning with July, 1931, the defendant refused to pay any further rental.

Two separate actions were instituted by the Bardes against the defendant for collection of rents of the Telegram building, both of which cases were decided in the circuit court in favor of the Bardes and appealed to this court, where the judgments of the circuit court were affirmed: *Barde v. Portland News Publishing Company,* 145 Or. 376 (26 P. (2d) 787, 28 P. (2d) 216); *Barde v. Portland News Publishing Company,* 152 Or. 77 (52 P. (2d) 194). On the first of those appeals it was decided by this court that there was a privity of estate between the defendant and the Bardes, and since the defendant was in possession and occupying the premises it was liable for the rents during the period of occupancy.

Prior to the second action the defendant had attempted to avoid liability for future rents by assigning the lease to another party. This court held, however, that by virtue of the provisions contained in the contract of May 25, 1931, between the plaintiffs in this case and the defendant, the latter had assumed the contract of December 3, 1921, between the Bardes and The Telegram Publishing Company, as modified by the later agreement of August 31, 1927, between The Portland Telegram and the Bardes.

No attempt has been made in this statement of facts to include all the details of the transactions leading up to and culminating in the sale of the stock and assets of The Portland Telegram to the defendant, or all the incidents occurring since that time which might throw some light on what actually took place during the negotiations between the present litigants.

The defendant tried this case on the theory that Scripps was the agent who acted for and on behalf of

the defendant in its purchase of The Portland Telegram; that Dan Powers and Benjamin had no authority to bind the defendant in any way in making said purchase; and that any information conveyed to them, or knowledge acquired by them, as to certain material facts, could not be said as a matter of law to be imputed to the defendant corporation or to Scripps, its bargaining agent. In other words, it is asserted that there is sufficient evidence in the record from which the jury could reach the conclusion that Scripps was the sole agent of the defendant corporation in finally determining whether or not the purchase of the Telegram should be made; that such purchase rested upon his decision; and that inasmuch as the plaintiffs have made positive misrepresentations as to certain material facts concerning the Telegram, upon which misrepresentations Scripps relied, they are not relieved as a matter of law from liability to the defendant, even though Powers and Benjamin may have been correctly advised as to the facts which were misrepresented to Scripps.

It is further contended by the defendant that the jury is the sole judge of the credibility of witnesses and of the weight to be given their testimony; and that the jury in this case, from the evidence before it, might well have reached the conclusion that the claim of plaintiffs that knowledge of certain facts was imparted to or in the possession of Powers and Benjamin, or even Scripps and Canfield, was not borne out by the evidence.

It is the plaintiffs' contention that prior to the conference between Scripps, representing the defendant, and the plaintiffs herein, beginning May 2, 1931, the terms and conditions of the sale of the Telegram to the defendant had been agreed upon; that Benjamin and Canfield in the preliminary negotiations were in fact representing the defendant; that they had full knowl-

edge of the assumption of the Barde lease by The Portland Telegram; and that it was fully understood between them and the plaintiffs that the only condition on which the Telegram would be sold was that the purchaser should assume this lease. The plaintiffs further assert that Benjamin had actually seen the lease and had the terms thereof read and explained to him; that Powers had received a copy of the lease before the first contract was entered into, and in addition had received on May 25, 1931, a copy of the supplementary agreement of August 31, 1927, between The Portland Telegram and the Bardes, before the supplemental agreement between the plaintiffs and the defendant was executed; that the defendant by taking possession of the Telegram plant on May 5, 1931, and occupying it, was placed in a position to ascertain for itself all the facts concerning which it claims misrepresentations were made by the plaintiffs, and is not in a position after executing that contract to recover in an action based upon such misrepresentations; that since the contract of May 25, 1931, provided that the defendant assumed all the liabilities of The Portland Telegram and of the plaintiffs under the Barde lease, the defendant was as a matter of law charged with notice of all the terms and conditions of the original lease and the assumption thereof by The Portland Telegram, and may not be heard to say that it relied upon the representations made by the plaintiffs concerning the liability of The Portland Telegram under said lease.

Section 9-203, Oregon Code 1930, provides:

"A witness is presumed to speak the truth. This presumption, however, may be overcome by the manner in which he testifies, by the character of his testimony, or by evidence affecting his character or motives, or by contradictory evidence; and where the trial is by the jury, they are the exclusive judges of his credibility."

Section 9-2001, Oregon Code 1930, provides that the jurors are "to be instructed by the court on all proper occasions,— * * * 2. That they are not bound to find in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a less number, or against a presumption or other evidence satisfying their minds."

In *Craft v. Northern Pacific R. Co.*, 62 Fed. 735, Judge Bellinger said:

"It is the province of the jury to pass upon the credibility of all witnesses, whether they are contradicted or not; and, while a witness is presumed to speak the truth, the manner in which he testifies, or the character of his testimony, is sufficient to overcome that presumption. Code Or., § 683 [now § 9-203, *supra*]. The jury are not bound to find in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a presumption or other evidence satisfying their minds. Id., § 845 [now § 9-2001, *supra*]."

Enough of the evidence given by the various witnesses has already been reviewed to indicate that what was actually said and done was a matter for the jury to determine. It might have considered the witnesses perfectly honest yet mistaken in their testimony, or parts of it, or it is possible that the testimony of certain witnesses seemed too improbable, even though uncontradicted, to be given any weight.

The jury undoubtedly considered the interest which the plaintiffs had in the outcome of the trial, the contradictions in their statements concerning the negotiations had with the defendant, the improbability of some of their testimony, and other factors which tended to lessen the conviction their positive statements might otherwise have carried. Redhead's relationship to Brockhagen and the improbabilities in his account of his

endeavor to sell the Telegram to Canfield and Benjamin without even knowing anything about the profits of the business or the value of the assets no doubt affected the weight which the jury gave to his testimony. The jury might also have considered in that connection the fact that according to his statement the principal matter discussed with Canfield and Benjamin was the assumption of the lease by the purchaser of the Telegram, whereas it was not shown that the plaintiffs at that time knew they were bound by any definite lease.

The testimony of Veatch, that the lease was discussed in his office in the afternoon of May 4, is directly contradicted by Scripps, and inferentially by Brockhagen, who stated that he did not think it was discussed at that meeting. Although Veatch testified that he was consulted in order to draw up an agreement between the parties and that he had obtained all the facts necessary for that purpose, nevertheless he stated that it was not he who drew up the contract of May 4 and he did not know by whom it was drafted. In addition, he was acting at that time as attorney for the plaintiffs and could not be said to be an entirely disinterested witness. Other parts of his testimony have hereinbefore been subject of comment.

The plaintiffs assert that Nelson was a disinterested witness and that his testimony as to the conference of May 25, 1931, so far as Powers was concerned was uncontradicted, and the circuit court in granting a new trial based its action on that view of the evidence. We find, however, in the record, that Scripps testified positively that several months after May 25 he and Powers did call on Nelson and that a conversation similar to that related by Nelson as of May 25 occurred at the later date. In this connection, in addition to what has already been quoted from his testimony, we call

attention to the following excerpt from the testimony of Scripps on re-cross-examination:

"Q. Now, you gave some testimony about that conversation with Mr. Nelson that you had a few months afterward; you don't mean to say that you didn't have any conversation with him on May 25th, 1931, do you? A. I don't think I saw him at all on May 25th, the more I think about it.

"Q. Are you sure? A. I am pretty sure of that.

"Q. How did you refresh your memory? A. Well, I was thinking about the business that I saw him about, that is this matter of the lease, and I know it wasn't discussed before September. * * * I never talked about any lease until Mr. Nelson told me about it, and the first time he ever told me about it was when I saw him in his office, and you said it was September 3d when they filed suit, something like that.

"Q. Yes, you think you didn't see him until he sued you? A. I don't think so."

We further find that Nelson himself stated that he had always been under the impression that the conference was had "later in the summer" than the date which he gave it on the witness stand. His testifying to the date of the conference as May 25 was based entirely on office memoranda of uncertain import so far as reference to Scripps is concerned. Other features of his testimony have already been mentioned. The jury might, and probably did, conclude that Scripps was not at Nelson's office on May 25, and that if Nelson was mistaken in that respect he might also have been mistaken as to the visit of Powers on May 25.

The question of whether or not any agent or attorney representing the defendant did receive from Nelson or from anyone else prior to the signing of the contract of May 25, 1931, a copy of the lease, was submitted by

the court to the jury under the following instruction, which was requested by the plaintiffs:

"If the jury finds that copies of the Barde lease, under which The Telegram Company occupied its building, were placed in the possession of any agent or attorney acting for defendant in the purchase of the capital stock and the properties of The Telegram Company, at or before the time the purchase was completed on May 25, 1931, then the jury can not find that there was any concealment from the defendant of the existence of said lease, and defendant can not be permitted any off-set against its indebtedness to plaintiffs by reason of any statements or representations regarding said lease."

Canfield died in 1932. Benjamin at the time of the trial was no longer in the defendant's employ. Neither he nor Powers was called as a witness. Benjamin was out of the state, but the defendant had stipulated with the plaintiffs that the latter might take his tesimony by deposition. Powers was subpoenaed by the plaintiffs but was not placed on the witness stand. Neither the plaintiffs nor the defendant appeared willing to vouch for the testimony of either Benjamin or Powers.

Both Benjamin and Powers were available to the plaintiffs and the defendant alike, as witnesses in this case. If either of them knew anything which was favorable to the plaintiffs, the latter were at liberty to avail themselves of such knowledge, just as the defendant was free to avail itself of their testimony, if helpful to it. Therefore, no inference can be drawn in behalf of plaintiffs because those individuals were not called by the defendant as its witnesses: *Hankins v. St. Louis-San Francisco Ry Co.*, Mo. App., 31 S. W. (2d) 596; *Metropolitan Life Ins. Co. v. Estes*, 228 Ala. 582 (155 So. 79); *Brown v. State*, 98 Miss. 786 (54 So. 305, 34 L. R. A. (N. S.) 811).

In 1927, at the time that the assets of the bankrupt The Telegram Publishing Company were purchased from the trustee in bankruptcy by Lofgren as trustee for Fleishhacker, the defendant herein also submitted a bid, which was less favorable than that of Lofgren. From the report of the trustee in bankruptcy it appears that he advertised for sale "all property belonging to the estate of said bankrupt, which includes the entire physical property inclusive of printing plant, contracts, franchises, good will, *leases,* accounts receivable, etc., all situate in the Telegram building, 11th and Washington streets, Portland, Oregon." (Italics supplied.) In attempting to fasten on defendant knowledge of the Barde lease and its terms and conditions the plaintiffs have called attention to the bid submitted by the defendant for the purchase of the assets of the bankrupt. There is nothing in the advertisement to indicate that the word "leases" therein used referred to the Barde lease. Moreover, the Barde lease expressly provided as follows: "It is further agreed that this lease is not and shall not be subject to or capable of involuntary assignment or transfer, whether such involuntary assignment or transfer be by legal proceedings or otherwise."

In buying the assets of the bankrupt publishing company the purchaser did not in anywise assume any liability to the Bardes except for rental during the time of remaining in possession of the leased property. In addition, Judge Curts, who died in 1930, had served as general counsel for the Scripps-Canfield chain of newspapers and it was he who acted on behalf of the defendant in submitting the bid. It certainly cannot be contended that even if Judge Curts had possessed any knowledge of that lease or of its terms and conditions, his knowledge could, as a matter of law, be imputed to

those who were entrusted with the purchase of the Telegram and its assets some four years later.

The first contract, to wit the one executed May 4, 1931, was between the plaintiffs and the defendant. By this contract the plaintiffs sold to the defendants all the capital stock owned by them in The Portland Telegram. There was little need, therefore, so far as plaintiffs were concerned, to insist that the defendant assume the Barde lease. On the other hand, there was a reason for the defendant's ascertaining what comprised the liabilities of The Portland Telegram, a corporation. Nevertheless, we find the plaintiffs' witnesses, including Fleishhacker and Brockhagen themselves, some of whom admit that they then knew nothing about the provisions of the lease, insisting that the principal topic discussed with the defendant's representatives in the negotiations leading up to the sale of the capital stock of The Portland Telegram was the assumption of the lease by the defendant.

Sometimes in the trial of a case a litigant may prove too much. In striving for emphasis he may sacrifice plausibility. Plaintiffs here would have the jury believe that all the agents and employes of the defendant company who at any time took part in the negotiations knew about the original Barde lease and the assumption of it by The Portland Telegram, several days prior to the first conference between Scripps and the plaintiffs in Portland on May 2, 1931. They even place the original lease and the assumption agreement in the office of Powers, yet at the close of the three-day conference between the plaintiffs and Scripps, plaintiffs have the parties to the conference repairing to Veatch's office to find out the terms of the lease. Why they expected that Veatch would have the document in his office is not clear, and he in fact had not seen it, ac-

cording to his testimony, since some four years prior to their call. It might have been somewhat difficult for the jury to understand why the plaintiffs had not produced a copy of the lease from the files of The Portland Telegram for this all-important conference.

Three weeks after the original contract was signed, on the very day that the agreement of May 25 was executed, when everybody connected with the defendant corporation is supposed to have known all about the lease for a long time and to have been further advised of it by an article in the Oregonian, and Powers is supposed to have on his desk a copy of the lease and the assumption thereof by The Portland Telegram, we find Powers, according to plaintiffs' contention, going to Nelson's office, accompanied by Scripps, to ascertain the provisions of the lease. And after this effort of Powers and Scripps to learn the terms of the lease, it would seem that nothing but a copy of the assumption of the lease, executed by The Portland Telegram, was given to Powers.

There never was any assignment of the original Barde lease to The Portland Telegram. The Portland Telegram did, by new agreement, assume the provisions of that lease, with certain exceptions hereinbefore mentioned. However, there was no usual, formal assignment of the Barde lease and the assumption of it by The Portland Telegram, to the defendant. We do not intend to infer by this that the general assignment of the assets of The Portland Telegram was not sufficient as an assignment of this lease.

It is an easy matter to point to certain statements made by witnesses and say that such statements are not disputed by other evidence. Yet in order to know what weight to give to the testimony of any one witness, all of his testimony must be taken into consideration,

as well as the interest which he has in the outcome of the case, the probability of his story, and whether or not his testimony produces conviction in the minds of the jurors. For, as said in *Coffman v. Dyas Realty Co.*, 176 Mo. App. 692 (159 S. W. 842), "the rule is well established that, though the evidence of a witness is uncontradicted, the question concerning it is still for the jury, as under our law the matter of credibility of the witnesses and the weight and value to be accorded to the testimony are committed to that tribunal alone."

It is argued by the plaintiffs that even though Scripps did not know of the existence of the agreement whereby The Portland Telegram assumed the provisions of the Barde lease, and even though in the final negotiations for the sale of The Portland Telegram the plaintiffs fraudulently misrepresented to Scripps the facts concerning the occupancy of the Telegram building, nevertheless the defendant had, through alleged information communicated to Benjamin and Powers, knowledge of the actual facts concerning the occupancy of the building by The Portland Telegram.

It has already been pointed out that neither Benjamin nor Powers was an officer of the defendant corporation. Although Benjamin did have interviews with Redhead, the broker who once had charge of the sale of The Portland Telegram, and with Brockhagen, there is no evidence from which the court could say as a matter of fact or of law that Benjamin had any power to commit the defendant corporation to any agreement as to the purchase of The Portland Telegram. The same may be said of Powers, who at times acted as attorney for the defendant corporation. Even Benjamin, according to the testimony presented by the plaintiffs, recognized that the final negotiations had to be conducted by one of his principals.

It is the theory of the defendant, as we have already pointed out, that Scripps was the bargaining agent for it in the purchase of The Portland Telegram, and the jury might well conclude that Fleishhacker, a busy man with wide financial interests, would not have spent three days in Portland with Scripps in concluding negotiations for the sale of The Portland Telegram unless Scripps was, as the bargaining agent for the defendant, the one upon whom rested the decision as to the purchase of The Portland Telegram.

In 2 Am. Jur. at page 292, § 374, it is said:

"The general rule accepted by the authorities is that the knowledge possessed or notice received by an agent is chargeable to the principal when not actually communicated *only* when relevant to matters intrusted to the agent and within his authority so that it is his duty to communicate such knowledge or notice to the principal. Knowledge acquired or notice received by an agent, which does not relate to the subject-matter of the employment, or which affects matters outside of the scope of his agency, is not chargeable to the principal unless actually communicated to him. *In other words, the knowledge or notice must come to an agent who has authority to deal in reference to those matters which the knowledge or notice affects.*" (Italics ours.)

Benjamin was employed by the Scripps-Canfield chain in an editorial capacity. The question of whether or not the information which he acquired, if any, concerning the Barde lease, in any way pertained to Benjamin's duties as an agent, related to the subject-matter of his employment, or affected matters outside the scope of his agency, was a matter for the jury to decide. The same may be said as to Powers.

The rule which charges the principal with what the agent knows is for the protection of innocent third parties and not for the assistance of those who attempt

to avoid the consequences of their own fraudulent acts. If the plaintiffs, in the final negotiations with Scripps for the sale of the Telegram, fraudulently misrepresented to Scripps certain material facts, with the expectation that Scripps would believe such misrepresentations and would rely thereon, and Scripps did believe those misrepresentations and did rely thereon, and by reason thereof the plaintiffs accomplished the sale of the Telegram to the defendant, it does not lie within the mouths of the plaintiffs to say that at some other time information was acquired by Powers and Benjamin showing the falsity of such misrepresentations. In *Wells v. Smith*, 3 K. B. (1914) 722, Scrutton, J., observed:

"In the second place, I am not aware of any case, and counsel did not refer me to one, where, when a man has made a statement untrue to his knowledge to induce another, whom he does not believe to know its untruth, to act upon it, and that other has acted upon it in ignorance and to his damage, the maker of the false representation has been allowed to protect himself by proving that an agent of the other knew of the untruth. Mr. Smith has made a statement which he knew to be untrue, believing it might be shown to Mrs. Wells and intending her to act upon it, while he did not believe she knew its untruth. This is fraud, and I should be very slow to allow the effects of actual fraud to be nullified by constructive notice. * * * Just as in Redgrave v. Hurd a man who told a lie as to his earnings was not allowed to protect himself by showing that he had offered the books for inspection, which, if carefully inspected, would have shown the untruth of his statement, so, I think, a man who tells a lie to another can not protect himself by saying 'Your agent should have warned you of my lie.' "

It is contended by the plaintiffs that "as a matter of law, appellant will not be heard to say that it did not

know of the existence of the Barde lease, when it signed a contract with the aid of counsel admittedly with full knowledge of its contents, which contract recites that the Barde lease *is* in existence, and by which contract the appellant in express language agreed to assume the liabilities of respondents under that lease." There is nothing in the contract of May 25 which expressly states that the Barde lease "is in existence".

The defendant is not here attempting to relieve itself of the obligations which it assumed in that contract. The contract itself does not state that the Barde lease imposes any liability upon The Portland Telegram or upon Fleishhacker and Brockhagen. All that it purports to do is to obligate the defendant to assume whatever liability such parties might have as a result of the Barde lease. It will be noticed that the provision of the May 25 contract which is now under consideration and which is set out at the beginning of this opinion refers to the lease of December 3, 1921, between Rose Barde and others as lessors, and The Telegram Publishing Company as lessee, and to all assignments thereof and agreements supplementary thereto; and that it does not refer to any assumption of said lease by The Portland Telegram, which purchased the assets of the bankrupt The Telegram Publishing Company.

In the May 25 contract the defendant did not agree to assume any lease. It did, however, promise to assume "all liabilities whatsoever" of The Portland Telegram and of Fleishhacker and Brockhagen under the Barde lease and all assignments thereof and agreements supplementary thereto; yet nowhere in the contract was it recited that there were any assignments of that lease or any agreements supplementary thereto, or that The Portland Telegram or Fleishhacker and Brockhagen had assumed any obligation under that lease. The agree-

ment of May 25 was drawn by the personal attorney of Fleishhacker and it might well be presumed that if Fleishhacker was correct in his assertion that he was insisting on the assumption of the Barde lease by the purchaser of The Portland Telegram, this final contract would have been more definite concerning the assumption thereof by the defendant.

In support of their contention, the plaintiffs refer to the case of *J. C. Corbin Co. v. Preston*, 109 Or. 230 (212 P. 541, 218 P. 917). In that instance the plaintiff commenced an action for the possession of certain furniture and household goods located in an apartment house in Portland, in order to foreclose a mortgage which it held on that personalty. The defendants attempted to set up as a counter-claim damages alleged to have been suffered by them through misrepresentation by plaintiff's assignor at the time the defendants purchased the furniture and the assignor's leasehold interest in the apartment house. These misrepresentations were alleged to consist in the assignor's falsely representing to defendants that such assignor "had been positively assured by the owner that the rent would not be raised at the expiration of the present lease, and that the defendants could remain indefinitely at the present rental of $650," and making other representations as to the owner's keeping the building in good repair. This court held that the leasehold interest purchased by the defendants was evidenced by a written lease in which all the respective obligations of the lessor and the lessee were clearly expressed, and that therefore the defendants were not entitled to rely upon the representations or promises made to them by the plaintiff's assignor to the effect "that the lessor would assume liabilities or grant privileges to the assignee of the lessee, not provided for in that instrument." In

the opinion there is no indication that the terms and conditions of the lease were misrepresented to the defendants by the vendor from whom the defendants purchased the furniture and the leasehold interest, or that the defendants did not know the terms of such lease.

Other authorities which are cited on this point and which seem to have little or no bearing on the case at bar are the following: *Johnston v. Spokane & Inland Empire Railroad Company*, 104 Wash. 562 (177 P. 810); *Union Central Life Insurance Co. v. Kerron*, 128 Or. 70 (264 P. 453); 10 R. C. L. 1047; 22 C. J. 1077.

In *Hutchinson v. Gorman*, 71 Ark. 305 (73 S. W. 793), the plaintiff sued the defendants to recover damages for fraud and deceit. The plaintiff had purchased from the defendants a tract of land and in the deed of conveyance it was recited that the plaintiff assumed a certain mortgage on the premises. The charge of fraud and deceit was predicated on misrepresentation by the defendants as to the amount of that mortgage. The trial court held that the plaintiff was estopped to maintain the action for the reason that he "had assumed the debt of Audigier to the building and loan association as a part of the consideration named in the deed". In passing upon this question, the appellate court said:

"Now, this being an action to recover damages for fraud and deceit, we think it is clear that the circuit court erred in holding that the acceptance of the deed by plaintiff, and the further fact that he assumed the debt of Audigier to the association, estopped him from bringing this action. Plaintiff is not suing on the contract, nor is he denying his contract. He admits the contract, and that he is bound by it, but founds his action on a tort by alleging that he was induced to make the contract by reason of a false representation made by defendant Baugh."

See, also, in this connection: *Texas Co. v. Schram,* Tex. Civ. App., 93 S. W. (2d) 544; *Long v. Los Altos Country Club Properties,* 122 Cal. App. 116 (9 P. (2d) 600); *Anderson v. Heasley,* 95 Kans. 572 (148 P. 738); *Geiger v. Cardwell,* 100 Kans. 65 (163 P. 613); *Carty v. McMenamin,* 108 Or. 489 (216 P. 228); *Sharkey v. The Burlingame Co.,* 131 Or. 185 (282 P. 546); *Boyer v. Edgemont Investment Co.,* 135 Or. 161 (295 P. 471).

The court thus instructed the jury, with reference to the matter now under consideration:

"If you find from the evidence that the allegations of the defendant's counter-claim have been established, I instruct you that the defendant is not precluded from recovery on its counter-claim by reason of the fact that the agreement of May 25, 1931, contains a provision that the defendant agreed to assume all liabilities of the plaintiffs and The Portland Telegram under the Barde lease of December 3d, 1921, and assignments thereof and supplemental thereto. In other words, that provision does not of itself preclude a recovery by the defendant on its counter-claim, if the defendant has shown that the purchase was induced by fraud as charged in the counter-claim. But, the fact that this provision is in the contract is a fact that you have a right to consider in determining the question of whether the defendant knew of the existence of the lease, and it is a fact to which you should give the weight that you think it is entitled to have."

No exception was taken by the plaintiffs to the giving of this instruction. Moreover, all the testimony given at the trial concerning the oral representations as to the tenancy of the Telegram building by The Portland Telegram was admitted without objection on the part of the plaintiffs.

What has already been said concerning the representations made by the plaintiffs is based on the assumption that the negotiations between the plaintiffs

and the defendant for the purchase of The Portland Telegram and its assets by the defendant were concluded as of May 25, 1931, and that any knowledge which the defendant or its bargaining agents might have acquired prior to that date, of matters alleged to have been fraudulently misrepresented by the plaintiffs, should be considered by the jury in arriving at its verdict. There is, however, ample evidence in the record from which the jury might have found that the negotiations were concluded on May 4 of that year; that any knowledge of plaintiffs' misrepresentations discovered between that time and May 25 was not chargeable to the defendant; and that by entering into the contract of May 25, such fraud was not waived by the defendant.

The respondents in their brief state:

"In its final analysis, the single purpose of the counter-claim is to substitute for the written contract a new contract under the mere pretense of fraud."

It is further asserted that since the terms of the contract between the plaintiffs and the defendant were reduced to writing, parol evidence is inadmissible to vary the terms of that contract, and that parol evidence is not admissible to prove fraud except in cases in which the fraud charged entered into the actual execution of the instrument. In this connection, this court in *Shafer v. Ekstrand*, 140 Or. 582, 598 (14 P. (2d) 287), in upholding a judgment for plaintiffs against the defendants based on fraudulent representations by the latter, said:

"Defendants argue that, if we uphold plaintiffs' right to recover damages suffered on account of defendants' fraudulent representations, we will vary the terms of the written deed by oral declarations. In this action, the plaintiffs do not seek to vary, alter, reform

or modify their deed. The judgment they have obtained in the trial court does not change any of the terms of that instrument.''

In the same opinion it is further stated:

''Error is assigned because of the modification of the requested instruction last mentioned on the ground that plaintiffs were not entitled to recover unless they could show fraud in the execution of the deed. This ground is untenable. Olston v. Oregon Water Power & Ry. Co., supra [52 Or. 343 (96 P. 1095, 97 P. 538)].''

This subject is well covered by the supreme court of Washington in the case of *Trotter v. Williams*, 167 Wash. 151 (8 P. (2d) 980), as follows:

''Appellants' fifth assignment of error is a complaint concerning the action of the trial court in admitting certain oral evidence. Appellants contend this was error on the ground that it varied the terms of the written exchange agreement. This claim of error is not well founded. In an action brought for relief because of fraud, it is competent to show all of the circumstances surrounding the transaction—oral promises and agreements contradicting and varying the writing, as well as all other matters—not for the purpose of showing a different contract from that actually entered into, but for the purpose of showing the contract actually entered into to be fraudulent and void. Gordon v. Hillman, 91 Wash. 490 (158 P. 96).''

See, also, in this connection: 10 R. C. L. 1058, 1059, Evidence, §§ 252, 253; 3 Jones' Commentaries on Evidence, (2d Ed.), § 1517.

Section 9-212, Oregon Code 1930, does not uphold the respondents' contention that parole evidence is inadmissible in an action of this nature. That section expressly exempts from the operation of the parole evidence rule the introduction of oral testimony to establish illegality or fraud.

It is asserted by the plaintiffs that in the sale and disposal of the Telegram to the defendant the parties were dealing at arm's length; that no fiduciary relationship existed between them; and that it was the duty of the defendant to use ordinary diligence in ascertaining the truth in regard to the matters which it now claims were represented. In this connection the court instructed the jury as follows:

"A seller of property who makes a statement concerning a matter susceptible of actual knowledge and in the form of a positive assertion, is required to speak the truth, and can not escape liability on the plea that the purchaser was not entitled to rely upon the representation made, or that the purchaser was negligent because of his failure to make such investigation as would have disclosed the falsity of the representations. If, therefore, you find that any of the representations were made as alleged and were false and relied on by the defendant, you can not find against the defendant simply because the defendant may have been negligent in failing to investigate and ascertain the facts. But, if you find that the defendant did in fact investigate and relied on its own investigation rather than on any misrepresentations made to it by the plaintiffs, then the defendant can not recover on its counter-claim."

In the case of *Outcault Advertising Co. v. Jones*, 119 Or. 214, 221 (234 P. 269, 239 P. 1113), this court said:

"One who intentionally, knowingly and wilfully makes a false statement to another thereby inducing the other to enter into a contract which he would not have made but for such false statements ought not to be heard to say that the injured party should not have believed it but should have instituted an independent inquiry for the purpose of ascertaining the truth of such representation before entering into the contract: 'A person can not escape the consequences of a deliberate false representation, made with intent to deceive, and which did deceive, by showing that the other party had

the opportunity to ascertain the truth for himself.'
13 C. J. 392, § 301; Davis v. Mitchell, 72 Or. 165, 185
(142 P. 788), and following, Linington v. Strong et al.,
107 Ill. 295, 302, cited in C. J. above under note 99.''

A distinction is often made in decisions, between
negligent or innocent misrepresentation and positive
and intentional misrepresentation. In the case at bar
the defendant relies not upon negligent or innocent
misrepresentation by the plaintiffs, but on positive and
intentional representations which were made, according
to the defendant, for the purpose of having the defend-
ant believe them and rely upon them. As said in the
annotation in 61 A. L. R. at page 497:

''Where the seller practices active and wilful fraud
upon the buyer in misrepresenting the article sold, in-
tending that the buyer shall rely upon the representa-
tions, he can not, according to the weight of authority,
escape liability for his fraud, on the ground that the
buyer gave credence to the representations and did not
avail himself of his opportunity to investigate the
same:'' citing, among other cases, Davis v. Mitchell, 72
Or. 165 (142 P. 788), and Ziegler v. Stinson, 111 Or.
243 (224 P. 641).

''Positive statements of a vendor as to past or pres-
ent rentals or the past profits or earnings of a business
are usually held to be representations of fact upon which
fraud may be predicated if they are false, since these
are matters within the vendor's own knowledge, and
redress will not be denied on the ground that the vendee
could have learned the truth by investigation: 12 R. C.
L. 287, 26 C. J. 1204.

\*       \*       \*       \*       \*       \*       \*

''But, a vendor who has misrepresented a material
fact to his prospective vendee and misled the latter to
his injury, will not be permitted to say to him, 'You
ought not to have believed or trusted me,' or 'You were
yourself guilty of negligence,' Bigelow on Frauds, 523,

528, 534; Speed v. Hollingsworth, 54 Kan. 436 (38 P. 496)."

It may be stated as a general rule that contributory negligence of the vendee is not a defense to an action for deceit when the vendor has knowingly made false representations, intending to deceive the vendee, even though the means of ascertaining the truth or falsity may have been available, and even though a prudent vendee might have determined their truth or falsity for himself. See Harper's Law of Torts, § 224; 5 Williston on Contracts, Rev. Ed., § 1516, page 4229; Bigelow on Frauds, 523, 524; *Smith v. Martin,* 93 Vt. 111 (106 Atl. 666); *Shwab v. Walters,* 147 Tenn. 638 (251 S. W. 42); *Mergenthaler Linotype Co. v. Evans,* 69 Fed. (2d) 287; 42 Harvard Law Review 734, at 739; 16 Virginia Law Review 749, at 763; 18 Virginia Law Review 703, at 709.

The instruction last above quoted correctly states the law, and the trial court did not err in refusing to give plaintiffs' requested instruction to the effect that it was the duty of the defendant "to make investigation of all matters relating to the purchase," and that "if there was no effort on the part of the plaintiffs to prevent or to forestall investigation with respect to the property purchased, defendant could not thereafter assert that it was misled by plaintiffs."

After the contract of May 4, 1931, was entered into the defendant took possession of the Telegram plant. Most of the time, according to some of the testimony, between May 4 and May 25, when the supplemental agreement was executed, was taken up in checking over the books of The Portland Telegram, to ascertain the current assets and liabilities. The defendant contends that the sale was made on May 4, while the plaintiffs

assert that the contract of May 4 remained merely executory and that the sale was not consummated until May 25. It is not necessary, however, to determine which of these contentions is correct. The court instructed the jury in this respect as follows:

"The transaction involving the purchase and sale of the Telegram property was concluded by the execution of the contract of May 25th, 1931, and I therefore instruct you that if, before that contract was executed, the defendant was fully advised of all the facts with respect to the matters concerning which claims of misrepresentation have been made, then your verdict must be for the plaintiffs.

"If the defendant knew the facts about the Barde lease before the execution of the agreement of May 25th, 1931, you must disregard the claim of misrepresentation in that particular. If the defendant knew before the execution of the contract of May 25th, 1931, the facts whether or not The Portland Telegram's business operations were profitable, or otherwise, you must disregard the claim of misrepresentation in that particular. And if the defendant knew before May 25th, 1931, the facts in respect to the alleged representations regarding advertising, you must disregard the claim of misrepresentation in that particular.

"The burden resting upon the defendant in this case includes the burden of proving by clear and convincing evidence its want of knowledge of the actual facts, because a person who knows the facts can not be heard to say that he relied on a misrepresentation respecting those facts. In this case the defendant is a corporation, a legal entity separate and distinct from its stockholders. It acts through natural persons, however, through its officers and agents. In the transaction here in question, if you find from the evidence that knowledge of any of the facts respecting which misrepresentations are claimed to have been made was had, or obtained before the execution of the agreement of May 25th, 1931, by any of the defendant's agents or representatives acting for it in the transaction, and while so acting,

then you must find that knowledge was the knowledge of the corporation itself,—that is to say, of the defendant.''

These instructions, together with others, submitted to the jury the question of whether or not the defendant did before the execution of the contract of May 25, 1931, have knowledge of the actual facts concerning matters alleged to have been misrepresented, and in view of the facts and circumstances in this case the finding of the jury adverse to the plaintiffs' contention precludes further inquiry into that matter. The court cannot say as a matter of law that the defendant did, after it took possession of the Telegram plant and before the execution of the agreement of May 25, 1931, become possessed of the actual facts relating to the Barde lease, to the profitableness of the Telegram's business, and to the advertising.

On the question of damages the court instructed the jury as follows:

''The measure of damages in a case of this kind is the difference, if any, between the actual value of the property transferred to the defendant at the time of the purchase,—that is to say, the actual value of the stock and assets of The Portland Telegram,—and the purchase price which the defendant agreed to pay and that amount would be the amount of damages to be allowed to the defendant on its counter-claim, if the defendant has established any of those charges of fraud.

''If you come to the question of damages, you have the right in computing the value of the Telegram property at the time of the sale to determine whether the Barde lease was an asset of value on the one hand or was a burdensome charge on the other, and if you find that it was a burdensome charge, you should consider the extent to which it lowered the actual value of the properties transferred to the defendant.''

No exception was taken to this instruction. It is a correct statement of the law, as held in numerous decisions of this court: *Howard v. Merrick*, 145 Or. 573, 581 (27 P. (2d) 891), and authorities therein cited; *Southern Oregon Orchards Co. v. Bakke*, 106 Or. 20, 27 (210 P. 858).

The amount paid by the defendant for the property was the sum of $750,000 and the assumption of the lease. As a matter of fact the purchase price was really $30,000 in excess of $750,000, for the reason that it was discovered after the execution of the May 25 contract that the defendant was required to pay some $30,000 more on the current liabilities than originally contemplated. There was undisputed testimony to the effect that the lease on the Telegram building was very onerous and the taxes and cost of upkeep amounted to more than the revenue that could be derived from the building; and that the rental at the rate at which it was being paid at the time of the purchase would aggregate more than $300,000 for the remainder of the term. There was, however, in the leasing agreement, as hereinbefore pointed out, a provision for reappraisal of the real property apart from the building at the end of the first ten years of the lease and at the end of every five years thereafter, with adjustment of the rental on the basis of eight per cent per annum of the actual cost of the building plus the value of the land as then appraised.

The good will of the Telegram was carried on its books at $500,000. The evidence is that instead of making an annual profit of $50,000, as defendant claims plaintiffs represented, the Telegram suffered an annual loss of over $70,000. There is further evidence that the value of good will is based on profits made by the company. The machinery and equipment of the Telegram

plant were antiquated and of little value. The current liabilities greatly exceeded the current assets.

It is asserted by the plaintiffs that the defendant has not shown what damage, if any, it has suffered because of the alleged fraudulent representations by plaintiffs. In other words, the plaintiffs would require the defendant to allege and prove definitely the amount of damage suffered by it in connection with each charge of misrepresentation. This subject, however, was covered by the instruction which we last quoted and the authorities cited in support of the correctness of that instruction, to the effect that if there were fraudulent representations made by plaintiffs and they were made for the purpose of having the defendant rely upon them and defendant did rely thereon, then the defendant is entitled to recover the difference between the amount' paid for the property and its actual value. There is sufficient competent evidence to support the damages awarded the defendant by the jury.

The court gave the following instruction relative to defendant's claim of misrepresentation by plaintiffs as to the advertising which they controlled and what they would do for the defendant in the event that it purchased the Telegram:

"I further instruct you that if you find from the evidence that at or prior to the time the defendant purchased from the plaintiffs the capital stock and assets of The Portland Telegram, the plaintiffs, either directly or through their authorized agent, falsely and fraudulently represented to the defendant that the plaintiffs, through their connections and influence, controlled the advertising of the principal department stores in Portland, Oregon, and that plaintiffs could and would make sure that the defendant, if it purchased said stock and assets of The Portland Telegram, would receive in the future from each of said department stores not less than the amount of advertising that had

been received theretofore by the said Portland Telegram, and if you further find that the plaintiffs did not, through their connections or influence, control the advertising of said department stores, and at the time plaintiffs made said promise, if any, they intended not to perform the same, and did not perform the same, and if you further find that said representations and promise, if any, were made by the plaintiffs with the intent that defendant should believe and rely upon them, and thereby be induced to purchase The Portland Telegram, and if you further find that defendant was justified in relying upon said representation and promise, and did so, if there were any made, and was induced thereby to purchase the property and by reason thereof suffered damage, then the defendant is entitled to recover upon its counter-claim the amount of such damage.

''In connection, however, with the last instruction, you are instructed that promises or assurances which the seller may make to the buyer with respect to what the seller will do in the event that the sale is made, can not be considered fraudulent misrepresentations unless such promises or assurances were made with the intent upon the part of the person making them that they should not be carried out.

''If plaintiffs, in negotiating the sale of the Telegram property to defendant, made promises or gave assurances to defendant that plaintiffs would cooperate in assisting defendant in securing advertising for its paper after purchase of the Telegram property, and if such promises or assurances were made in good faith and were not made with a present intention to avoid carrying them out, then the extent to which such promises or assurances were carried out would be entirely immaterial, and defendant would not be permitted to rely on such promises or assurances as wrongful misrepresentations. Therefore, if you find that any promises or assurances given by plaintiffs with respect to advertising were made in good faith and were not made with a present intention to refrain from carrying them out, you must disallow defendant's contention that

misrepresentations were made to it with respect to advertising; and defendant in such case can not be permitted any offset against its indebtedness to plaintiffs by reason of any such promises or assurances with respect to advertising.''

There was no exception taken to the foregoing instruction. It clearly and fully submitted to the jury the question of whether there were misrepresentations made by the plaintiffs as alleged by the defendant, concerning their control over advertising and how they would exercise that control for the defendant's benefit.

The misrepresentation in this regard, as alleged in defendant's answer, consisted in plaintiffs' stating that they controlled the advertising of certain department stores. This was a representation not as to the future but as to present conditions. The evidence given by Nelson, one of plaintiffs' own witnesses, was to the effect that certain department stores had placed considerable advertising with the Telegram in order to induce Fleishhacker to retain the ownership of the paper, to forestall the entry of Hearst interests into the newspaper field in Portland; and the amount of such advertising therefore was not entirely due to any control which plaintiffs had over those stores. In addition to the foregoing, there is evidence from which the jury might believe that the plaintiffs did, as inducement to the defendant to purchase the paper, promise that they would cause the advertising to be continued in the Telegram, and that such promise was made without any intention on the part of plaintiffs to fulfill it.

The alleged fraud in respect to the advertising consisted in promises and misrepresentations, the latter in part as to the future and in part as to existing facts, so blended or associated that they might all be consid-

ered on the issue of fraud: *Sharkey v. Burlingame,* 131 Or. 185 (282 P. 546) ; 68 A. L. R. 638 (V) ; 51 A. L. R. 85.

In view of the facts and circumstances in this case it was not error for the court to submit to the jury the question of whether or not the plaintiffs did represent to the defendant that they controlled a large part of the advertising of Portland department stores, and whether the promise made by them as to future advertising to be enjoyed by the defendant was or was not made with the intention of performance: *Elastic Paint & Mfg. Co. v. Johnson,* 127 Or. 647, 652 (271 P. 996) ; *Burgess v. Charles A. Wing Agency,* 139 Or. 614 (11 P. (2d) 811) ; *Richer v. Burke,* 147 Or. 465 (34 P. (2d) 317) ; *Sharkey v. Burlingame,* supra.

We are of the opinion, after a thorough consideration of all the record in this case, that the trial court did not err in submitting to the jury the determination of the issues made by the pleadings; that there was no error committed during the trial of the case; but that the court erred in setting aside the judgment and ordering a new trial. The order setting aside the judgment and granting a new trial should be reversed and the cause remanded with instruction to the circuit court to reinstate the judgment based on the verdict of the jury in favor of the defendant.

RAND, J., concurs.